Tess ROHAN, Plaintiff–Appellant,

v.

NETWORKS PRESENTATIONS
LLC, Defendant–Appellee.

No. 03–1637.

United States Court of Appeals,
Fourth Circuit.

Argued: Feb. 26, 2004.

Decided: July 8, 2004.

**268**

Appellant. Bruce L. Marcus, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Joseph A. Compofelice, Jr., Marcus & Bonsib, Greenbelt, Maryland, for Appellee.

Before WIDENER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge DUNCAN wrote the opinion, in which Judge WIDENER concurred. Judge SHEDD wrote a dissenting opinion.

## OPINION

DUNCAN, Circuit Judge:

Plaintiff-appellant Tess Rohan appeals the April 17, 2003 judgment of the District Court for the District of Maryland (J. Frederick Motz, *Judge*) granting summary judgment to defendant-appellee Networks Presentations LLC ("Networks"). Rohan sued Networks for breach of contract under Maryland law and for wrongful discharge and hostile work environment under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (West .2004). The district court granted summary judgment because it found that Rohan was not a "qualified individual" under the ADA and that Networks did not breach its employment agreement with Rohan. *See Rohan v. Networks Presentation LLC,* No. JFM–01–1749 (D.Md. Apr. 17, 2003). We affirm the district court's judgment; however, we do so on other grounds.[1]

### I.

Rohan, an actress and singer, suffers from posttraumatic stress disorder ("PTSD") and severe depression stemming

**ARGUED:** Peter Charles Cohen, Charlson Bredehoft, P.C., Reston, Virginia, for

1. "[W]e are entitled to affirm the court's judgment on alternate grounds, if such grounds are apparent from the record." *MM ex rel.* *DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 536 (4th Cir.2002).

from childhood incest and sexual abuse.[2] According to Mary Sheahen, Rohan's therapist, and Dr. David Irwin, her psychiatrist, Rohan's PTSD causes her to experience "flashback episodes" of the abuse:

Tess persistently reexperiences the molestation through recurrent and intrusive recollections of portions of the molestation, including images, thoughts and perceptions of what occurred or what she believes occurred, and through dissociative flashback episodes or abreactions (severe flashbacks) in which she acts and feels as if the molestation was reoccurring in the present moment.

In addition, Tess experiences intense psychological distress at exposure to certain external cues that symbolize or resemble her father or her interaction with him as a child. For example, Tess experiences significant mental distress when she observes a parent scolding a child, or when she sees or interacts with a man who resembles or reminds her of the likeness or mannerisms of her father, or sees such a man in a movie. Such interactions often trigger in Tess flashbacks or abreactions to when she was abused as a child. Moreover, when Tess relives the molestation, she experiences a variety of physiological reactions, including (at different times) hyperventilation, inability to speak, inability to open her eyes, gagging, bodily pain, and/or staring off into space.

J.A. at 623, 634. Rohan's mental health care providers opine that her depression and PTSD are severe and chronic, and "have imposed, and will continue to impose for some time, significant limitations on her social and personal functioning, especially her ability to interact with and trust others." J.A. at 627, 634.

In early 2000, Rohan was performing in a production of *The Unsinkable Molly Brown* in Maryland. Rohan experienced some episodes during this time. Patricia Gentry, Networks' casting director, was also performing in this show. At the same time, Networks, which produces Broadway musicals that tour the United States, was organizing a touring theatre company for the musical *Jekyll & Hyde.* Gentry, who had known Rohan since high school, believed that Rohan had "the right kind of voice" for the role of "Lady Beaconsfield." Despite her knowledge of Rohan's mental illnesses, she arranged for Rohan to audition.

After several callback auditions before *Jekyll & Hyde's* director, Michael Jaeger, and the musical director and choreographer, Networks hired Rohan to perform as "Lady Beaconsfield" and as a member of the "Ensemble." Thereafter, Networks and Rohan signed an employment agreement. Rehearsals would take place in New York City from August 23 to September 6, 2000, and in Charleston, South Carolina from September 7 to September 17, 2000. Performances would begin thereafter and Rohan's employment would continue, assuming the show's success, until at least June of 2001.

During the New York City rehearsals, Rohan had at least three episodes. Consequently, Rohan told Gretchen Pfarrer, the *Jekyll & Hyde* company manager,[3] and Janine Vanderhoff, the stage manager, about her past abuse and the resultant

---

**2.** Because we review a grant of summary judgment, we set forth the facts in the light most favorable to Rohan, the non-movant, and draw all reasonable inferences in her favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**3.** As company manager, Pfarrer was the most senior manager who traveled with the tour.

mental illnesses, and explained how they could assist Rohan when she experienced an episode. She also provided a list of emergency contact numbers that included her (then) husband, Richard Rohan,[4] her therapist and her psychiatrist. Pfarrer and Vanderhoff agreed to help Rohan through her episodes and, in fact, did help her through numerous episodes over the next several months.

Rohan paints a vivid picture of life in the theatre. The cast joked with each other a great deal, and the jokes included ones of a sexual nature. On a number of occasions, when a cast member touched Rohan in a way she felt was inappropriate, she slapped that person in response. Particularly while traveling from one performance to the next on the tour bus, Rohan found the sexually charged antics of her colleagues difficult to bear. According to Rohan, many of the underage cast members drank alcohol and many cast members were smoking marijuana. On one occasion, a cast member urinated on a hotel door. In general, Rohan found certain cast members to be immature (many of them were considerably younger than Rohan) and, at times, offensive. To the extent possible, she avoided these people.

Rohan also made many friends on the tour. According to Rohan, she became friends with, among others, Jennifer Carroll, Rana Fellgraff, Janine Vanderhoff, Annie Berthiaume, and Erik Shark, a male cast member whom Rohan described as "a good friend." J.A. at 280. One indication of the strength of these friendships was that Rohan shared with these individuals some or all of her history of mental illness and sexual abuse.[5] Carroll, the wardrobe supervisor, told Rohan she was "the easiest female in the show to work with." J.A. at 90.

Rohan had several more episodes during rehearsals in South Carolina, but the episodes abated during the first six weeks of performances. During this time, Rohan was "very upbeat," J.A. at 67, and was "surprised at how good [she] felt most of the time," J.A. at 276. Her happiness stemmed in part from the positive reviews of her performance. Jaeger told her that her performances were "outstanding" and to keep up the "great work on stage." J.A. at 33, 35.

As the finalization of her divorce, and the holidays, approached, however, Rohan began to have episodes with increasing frequency—on October 11, November 7, November 20, November 22, and December 1. The episode on November 7 came during a performance. Although Rohan had to return to the hotel in the middle of the show, she had already completed the "Lady Beaconsfield" role and Pfarrer excused her from her role in the "Ensemble," thereby minimizing the impact of her departure.

As these episodes increased in frequency, Rohan began to talk about suicide. On October 11, she made a small cut on her wrist with another cast member's razor. On November 17, Rohan told Pfarrer that she was "going to walk into traffic and end this once and for all."[6] J.A. at 54. Pfarrer instructed a crewmember to accompany Rohan to the hotel for safety. Rohan

4. Richard and Tess Rohan were divorced during the *Jekyll & Hyde* tour.

5. At a meeting at the end of rehearsals, Rohan disclosed to the entire cast and crew her history of childhood abuse and the effects of her depression and PTSD. Rohan claims that Networks forced her to make this disclosure.

This event serves as the basis for Rohan's hostile work environment claim.

6. At her deposition, Rohan claimed that this statement was made in jest, but did not dispute that she made the statement.

emailed Jaeger that she "came back to the hotel feeling suicidal." J.A. at 27. On December 1, while on the bus, Rohan took several tranquilizers and stated that she "didn't feel like living anymore." J.A. at 56, 98. Rohan then told Pfarrer that she needed to call her therapist. Pfarrer stopped the bus as quickly as possible to permit Rohan to make the phone call.

During her deposition, Rohan explained that this suicidal talk was "passive"—that she never intended harm to herself, but rather used such statements as a sort of cathartic release. Nevertheless, at the time, Pfarrer felt unable to support Rohan further. After the December 1 episode involving the tranquilizers, Pfarrer immediately contacted Gregory Vander Ploeg, Networks' associate general manager. Vander Ploeg suggested that he and Pfarrer have a meeting with Rohan regarding her ability to continue on the tour. According to Pfarrer:

> [T]he management had decided to release Ms. Rohan at the beginning of the holiday break. The decision came from want[ing] to help her, and since she had threatened not to come back after the layoff, this would help her get more assistance for her "condition" and get her off the sporadic traveling schedule. This would also resolve the disruptions that the company has been dealing with over the past several months and relieve them from the stress involved with the long bus rides that caused Ms. Rohan's episodes.

J.A. at 56.[7] On December 3, Vander Ploeg called Sheahen and Rohan's ex-husband Richard Rohan to describe the situation. According to both Sheahen and Mr. Rohan, Vander Ploeg explained that Networks intended to fire Rohan on December 6. Mr. Rohan stated that Rohan should be accompanied on the flight home, and agreed to meet her at the airport in Maryland when she arrived. Vander Ploeg purchased a one-way ticket for Rohan for the afternoon of December 6.

On December 5, Vander Ploeg met the tour in Gainesville, Florida. After that night's performance, Vander Ploeg called Rohan's room. He left a message asking Rohan to meet with him and Pfarrer in the morning. At approximately 2:00 a.m. on December 6, Rohan returned Vander Ploeg's call. Rohan demanded that they meet immediately if she was being fired. Vander Ploeg stated that they should meet in the morning to discuss "her well-being on the tour." J.A. at 45. Rohan asked if she was being fired. Vander Ploeg did not answer the question, but responded that he wanted to discuss some concerns. Rohan said that if Networks intended to fire her at the December layoff, then she demanded to leave that morning. Vander Ploeg asked, "You wish to leave the tour tomorrow morning?" Rohan replied, "Yes, if it's the company's intention to release me at the layoff, I want to go home tomorrow so can you get me on a flight out in the morning?" J.A. at 45. Vander Ploeg told her he would arrange for the plane ticket.

Vander Ploeg subsequently met with Pfarrer and described his phone conversation with Rohan. During this meeting, Vander Ploeg and Pfarrer received a phone call from an actor on the tour, who told them that Rohan was very upset. Vander Ploeg and Pfarrer went to Rohan's room. When they arrived, they found Rohan crying and packing her bags as fast as she could. They attempted to console her,

---

**7.** The tour performs no shows during the Christmas holiday season and the cast and crew are sent home until the tour restarts. This break is referred to as the December layoff.

but Rohan again demanded that they immediately get her a flight home. Vander Ploeg purchased tickets on a 7:00 a.m. flight for himself and Rohan. They returned to Maryland on that flight.

Rohan filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which issued her a right-to-sue letter on March 19, 2001. Rohan filed this civil action on June 15, 2001, asserting wrongful discharge, failure to accommodate and breach of confidentiality claims under the ADA, and invasion of privacy and breach of contract under state law. The district court dismissed the failure to accommodate and breach of confidentiality claims under Fed.R.Civ.P. 12(b)(6). *See Rohan v. Networks Presentation LLC*, 175 F.Supp.2d 806, 809–14 (D.Md.2001). Rohan then filed an amended complaint, which asserted claims for wrongful discharge and hostile work environment under the ADA, and the two state law claims.

After discovery, Networks moved for summary judgment,[8] which the district court granted on April 17, 2003. *Rohan v. Networks Presentation LLC*, No. JFM–01–1749 (D.Md. Apr. 17, 2003). As to the ADA claims, the district court held that Rohan was not a "qualified individual with a disability," and therefore could not bring a claim under the ADA, because she was unable to perform an essential function of her job. *See id.* at 7–8. The district court

identified that essential job function as the ability to interact with others. *Id.* The district court determined that Networks had not breached its employment agreement with Rohan because Rohan's inability to perform an essential function of her job justified her termination without notice. *See id.* at 12–13. Finally, the district court declined to exercise supplemental jurisdiction over the remaining invasion of privacy claim. *Id.* at 14. Rohan appeals only the grant of summary judgment on her ADA and breach of contract claims.

## II.

Although the *prima facie* elements of wrongful discharge and hostile work environment claims under the ADA are distinct, the claims share a common requirement: the plaintiff must be within the ADA's protected class.[9] *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir.2001) (wrongful discharge); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir.2001) (hostile work environment). "One is within the ADA's protected class if one is a 'qualified individual with a disability.'" *Haulbrook*, 252 F.3d at 702 (quoting 42 U.S.C. § 12112). Thus, to survive summary judgment, Rohan had to produce evidence that she is both qualified and disabled. The district court concluded that Rohan was not "qualified" because

---

**8.** Prior to moving for summary judgment, Networks filed a second motion to dismiss. The district court denied this motion on April 1, 2002. *See Rohan v. Networks Presentation LLC*, 192 F.Supp.2d 434 (D.Md.2002).

**9.** To establish a *prima facie* wrongful discharge claim under the ADA, a plaintiff must show that (1) she was a "qualified individual with a disability"; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am., Inc.*, 252

F.3d 696, 702 (4th Cir.2001). In an ADA hostile work environment claim, a plaintiff establishes a *prima facie* case if she demonstrates that (1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir.2001).

she could not perform an essential function of her job. We disagree. We do, however, conclude that Rohan was not "disabled" under the ADA because (1) she did not suffer an impairment that substantially limited her in one or more major life activities, and (2) no evidence suggests that Networks regarded her as such.[10]

## A.

An individual is "disabled" if she "(A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [has] a record of such an impairment; or (C) [has been] regarded as having such an impairment." 42 U.S.C. § 12102(2). "[T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled...." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Rohan asserts that she is disabled because (1) her depression and PTSD are mental impairments, (2) these impairments substantially limit her in the major life activity of interacting with others, and (3) Networks regarded her depression and PTSD as substantially limiting Rohan in the major life activity of working.

## 1.

Networks inexplicably disputes that Rohan suffers from a mental impairment. However, Rohan has proffered the affidavits of her therapist and her treating psychiatrist, both of whom diagnose her with PTSD and depression. The detailed account of her problems during the tour, which Rohan submitted to the EEOC, substantiates the effects of PTSD and depression on Rohan, as explained by her therapist. Moreover, the affidavit of Gretchen Pfarrer—Networks' employee—contains a description of Rohan's conduct during the tour that largely corroborates Rohan's version of events. In light of this medical and lay evidence supporting the existence of Rohan's mental impairment, we are at a loss to understand how, at this stage of the litigation, Networks can suggest to the contrary or fail to recognize that its dispute of this material fact would create a genuine factual issue warranting remand. *See* Fed.R.Civ.P. 56.

However, we need not decide whether this evidence would be sufficient to sustain Rohan's claim at trial.[11] When reviewing the grant of summary judgment, we must view the facts in the light most favorable to the non-movant. Accordingly, we must

---

**10.** Because Rohan has not established that she is a "qualified individual with a disability," we address the wrongful discharge and hostile work environment claims together and do not address the remaining elements of either claim.

**11.** Networks also argues that Rohan cannot present at trial any expert testimony establishing her mental impairment because she has failed to designate an expert and provide Networks with a written expert report under Fed. R.Civ.P. 26(a)(2), and that she therefore cannot establish her impairment for purposes of summary judgment. Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial ... or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). Although the sanction is "automatic," *id.* advisory committee's notes (1993), it is so only when the failure to disclose is "without substantial justification" and harmful to the opposing party. These considerations are factual, and lie within the district court's "substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir.1995). Because the district court did not address this argument in its decision, and because Networks failed to assert this omission (if such it was) as a point of error, we decline to consider it in the first instance on appeal.

assume that Rohan's depression and PTSD are mental impairments within the meaning of the ADA. *Cf. Baird ex rel. Baird v. Rose*, 192 F.3d 462, 467 n. 3 (4th Cir.1999) (recognizing depression as an impairment); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.1998) (recognizing PTSD as an impairment). We therefore turn to a determination of whether the impairments substantially limit a major life activity.

### 2.

■ The term "major life activities" refers to "those activities that are of central importance to daily life," *Toyota Motor*, 534 U.S. at 197, 122 S.Ct. 681, and "that the average person in the general population can perform with little or no difficulty," *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999); *accord EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352–53 (4th Cir.2001). An impairment's impact on a major life activity must be "permanent or long-term." *Toyota Motor*, 534 U.S. at 198, 122 S.Ct. 681.

### a.

■ Rohan asserts that she is substantially limited in the major life activity of interacting with others.[12] The Ninth Circuit is the only federal appellate court to have held that interacting with others is a major life activity.[13] *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir.1999). We have expressed doubt on this point. *See Davis v. Univ. of N.C.*, 263 F.3d 95, 101 n. 4 (4th Cir.2001). As the First Circuit has explained, the concept of interacting with others

> is remarkably elastic, perhaps so much so as to make it unworkable as a definition. While such an ability [i.e., getting along with others] is a skill to be prized, it is different in kind from breathing or walking, two exemplars which are used in the regulations. Further, whether a person has such an ability may be a matter of subjective judgment; and the ability may or may not exist depending on context.... To impose legally enforceable duties on an employer based on such an amorphous concept would be problematic.

*Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 15 (1st Cir.1997). We decline to resolve this issue here because, assuming that interacting with others is a major life activity, Rohan has not demonstrated that it is an activity in which she is substantially limited. *See Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254–55 (10th Cir.2001) (finding plaintiff was not substantially limited in her ability to interact with others and thus declining to address whether interacting with others is a major life activity).

In *McAlindin*, the plaintiff was forced to take a leave of absence due to anxiety, panic and somatoform disorders. *McAlindin*, 192 F.3d at 1231–32. According to his medical evaluations, the plaintiff "became increasingly withdrawn and his ability to deal with people and stress was seriously diminished." *Id.* at 1235. He spent at least twenty hours per day at home, he avoided most activities "for fear that they will make him feel more anxious," and was

---

**12.** The Equal Employment Opportunity Commission's Compliance Manual defines interacting with others as a major life activity. *See* EEOC Compliance Manual § 902.3. However, the Compliance Manual is not binding on this court. *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 750 (4th Cir.1996).

**13.** The Seventh Circuit declined to address the issue, holding instead that interacting with others is an activity that "feed[s] into the major life activities of learning and working." *Emerson v. N. States Power Co.*, 256 F.3d 506, 511 (7th Cir.2001); *accord Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir.2002).

"not involved in any groups or political or religious affiliations." *Id.* (internal quotations omitted). As a result, the plaintiff had no social interaction outside of his family. Based on these facts, the Ninth Circuit found the limitation on interacting with others "sufficiently severe to raise a genuine issue a material fact" as to whether the plaintiff was disabled. *Id.* at 1235–36.

Rohan asserts that she is substantially limited in her ability to interact with others because her impairments cause her to (1) "avoid[ ] interaction with her parents and siblings"; (2) "avoid[ ] making friends," particularly with men; (3) "make [ ] minimal effort to have a social life"; and (4) cause her to have episodes, during which "no one can touch her." Appellant's Br. at 18 n. 10. She also points out that Networks admitted that Rohan was unable "to behave in a normal manner" and that "it was apparent [to Networks] that Ms. Rohan experienced difficulties in dealing with other members of the cast".[14] J.A. at 123–24.

Based on the record before us, Rohan might well be limited in her ability to interact with others to some extent. However, Rohan has not established that she was *substantially* limited in this activity. First, the record reflects that Rohan avoids interaction with her family because they do not believe her allegation that her father sexually abused her as a child. In other words, her difficulty interacting with them is a result of their disbelief, not her mental impairments.

Second, Rohan testified that she considered Jennifer Carroll, Rana Fellgraff, Janine Vanderhoff, Annie Berthiaune, Patricia Gentry, and Erik Shark as friends. The wardrobe supervisor found Rohan to be the easiest of the cast members to get along with. Thus, the fact that Rohan "avoids making friends" does not demonstrate a substantial limitation.[15] The record does reflect that Rohan found some cast members' conduct on the bus immature and even offensive. The fact that she chose to avoid such individuals, however, does not distinguish her from the general population. *See Sara Lee Corp.,* 237 F.3d at 352–53 (requiring limitation on major life activity to be greater than that of average person in population).

Third, accepting as true that Rohan can only make a "minimal effort" to have a social life, the record does not support her claim that this difficulty *substantially* limits her interaction with others.[16] Rohan's chosen profession required social interaction with the approximately sixty members of the cast and crew on an almost continuous basis, and, as noted above, she had a

---

**14.** These statements come from a letter from Networks' counsel to an EEOC investigator in response to Rohan's EEOC complaint. Although we will accept these statements as reflecting Networks' opinion of Rohan's behavior, we note that the letter vastly overstates Rohan's con-duct as reported by Pfarrer and Rohan, and is also at odds with portions of Rohan's deposition testimony.

**15.** In addition, although an inability to establish friendships might suggest a limitation in the major life activity of interacting with others, we question whether it is dispositive. Individuals can successfully interact with each other without necessarily becoming friends.

In the context of the ADA, which seeks to address discrimination in employment and public accommodations, "interacting with others" must refer to a more fundamental aspect of human interaction. *Cf. Soileau,* 105 F.3d at 15 (noting that "it may be that a more narrowly defined concept going to essential attributes of human communication could, in a particular setting, be understood to be a major life activity").

**16.** Although we need not answer it here, we note that what constitutes a "minimal" effort to have a "social life" is an exceptionally vague question. *Cf. Soileau,* 105 F.3d at 15.

number of friends among the cast. The opportunity for interaction outside of work was necessarily limited by the nature of her work. Rohan testified, however, that she was enjoying herself. During an extended stop in Dayton, Ohio, for example, she took ballet classes on her own.

Fourth, although Rohan appears to be almost completely incapable of interacting with others during her episodes, her episodes are sporadic and last, at most, thirty minutes. During the four months of her employment with Networks, Rohan appears to have experienced approximately thirty episodes. Intermittent manifestations of an illness are insufficient to establish a substantial limitation on a major life activity. *Sara Lee Corp.*, 237 F.3d at 352 (finding plaintiff who suffered epileptic seizures twice weekly on average was not substantially limited in major life activities of sleeping, thinking or caring for oneself). To hold otherwise "would expand the contours of the ADA beyond all bounds." *Id.*

Finally, Networks' perception of Rohan's limitations in social interaction is inapposite. Rohan's claim is that she is *in fact* substantially limited in the major life activity of interacting with others, not that Networks *regarded* her as such. These statements would only be relevant within the context of a claim of disability based on 42 U.S.C. § 12102(2)(C). Because Rohan's claim that her mental impairments substantially limit her in the major life activity of interacting with others is premised on 42 U.S.C. § 12102(2)(A), the statements on which Rohan relies are irrelevant.[17]

In sum, even construing the facts in the light most favorable to Rohan, she fails to demonstrate that her problems with social interaction over the course of her employment were "sufficiently severe" to establish a substantial limitation. As such, Rohan has failed to establish a genuine issue of material fact that she is disabled under 42 U.S.C. § 12102(2)(A).[18]

**17.** Of course, Networks' perception that Rohan had difficulty interacting with others *might* be relevant to issues other than whether Rohan is disabled under § 12102(2)(A). Our statement here relates *only* to the relevance of Networks' perceptions to Rohan's claim that her mental impairments in fact substantially limit her in a major life activity. Networks' stated perceptions might be relevant to other aspects of her claim. In addition, if an employer had some relevant medical expertise, its perceptions might warrant consideration under subsection (2)(A), but that circumstance is not before us.

**18.** The dissent accuses us of ignoring the affidavits of Rohan's therapist and psychiatrist and weighing against Rohan the evidence that (apparently) we do consider. Obviously, we disagree. First, we have accepted these affidavits for purposes of establishing Rohan's impairment. *See supra* p. 273. Second, for purposes of establishing that her impairment substantially limits a major life activity, "[i]t is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those

'claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] *in terms of their own experience* ... is substantial." *Toyota Motor*, 534 U.S. at 198 (emphasis added, second through fourth alterations in original) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)). To the extent that Sheahen's and Dr. Irwin's affidavits reveal Rohan's experiences in light of her impairment, they merely reiterate Rohan's self-reported experiences. Consequently, their affidavits do not alter our conclusion that Rohan has not shown that she is " *significantly* restricted" relative to "the average person in the general population." 29 C.F.R. § 1630.2(j) (emphasis added).

In addition, the dissent argues that we minimize the severity of Rohan's episodes. *Post* at 286. We do not. As we explain above, *see supra* p. 275–276, we recognize that Rohan is substantially incapacitated during her episodes, but these episodes occurred, at most, slightly more than twice per week on average. Under the ADA, the frequency of Rohan's

#### b.

Rohan also argues that Networks regarded her as substantially limited in the major life activity of working, qualifying her as disabled under 42 U.S.C. § 12102(2)(C). "[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). An employer regards a person as substantially limited in her ability to work if the employer perceived her "to be significantly restricted in [her] ability to perform either a class of jobs or a broad range of jobs in various classes." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 303 (4th Cir. 1998) (discussing 29 C.F.R. § 1630.2(j)(3)(I)). "[O]ne must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

According to Rohan, the record demonstrates that Networks perceived her to be significantly restricted in her ability to perform "the specific role for which she was hired as well as the performing arts in general" and to work in "all work environments where stress is a component of the workplace." Appellant's Br. at 20. Even when construed in a light most favorable to Rohan, however, the record does not support this assertion.[19] At most, the evidence Rohan points to merely reflects Networks' perception that she was unable to perform as an actress in a touring theater company.[20]

As Rohan points out herself, Networks never regarded her as unable to act or sing. In fact, it believed Rohan performed those dimensions of her job satisfactorily. Although Rohan argues that by December of 2000, Networks believed Rohan could not perform her role, she does so on the basis of a statement taken out of context. Vander Ploeg did make a suggestion to that effect, but it was based on the fact the "one-nighters were going to become more and more apparent during the course of the tour." J.A. at 363–64. The consensus of management appeared to be that the increased number of one-night performances would only add to the erratic nature of the tour schedule. Networks' concerns revolved around Rohan's ability to "withstand the rigors of a traveling tour." J.A. at 364. In fact, all of the other evidence

episodes simply do not establish a substantial limitation, regardless of each individual episode's severity. *Sara Lee Corp.*, 237 F.3d at 352. We also note that the record demonstrates that not all of Rohan's episodes were as severe as those noted by the dissent, *post* at 284–285.

19. That Networks regarded Rohan as unable to perform "the specific role for which she was hired" is, standing alone, insufficient to establish a disability under subsection (2)(C). *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139.

20. The district court found that "[t]he only reasonable conclusion to be drawn from the record is that Networks felt Rohan was unable to continue on the *Jekyll & Hyde* tour." J.A. at 666. The procedural posture of this case does not permit such a narrow view of the evidence. The only evidence supporting this conclusion was Patricia Gentry's statement that "once she is better she can get back on stage." J.A. at 30. As discussed below, the evidence suggests that Networks believed Rohan was unable to work in a traveling theater company *at all*, not simply that she was unable to continue on this particular tour. As the non-movant, Rohan is entitled to this inference.

on which Rohan relies to support her argument reinforces this view.[21] Thus, Rohan has not demonstrated that Networks perceived her as being substantially limited in her ability to work as an actress; rather, at best, Rohan has demonstrated that Networks regarded her as unable to work as an actress in a touring theatre company.

■ The question we must address, therefore, is whether Networks' perception that Rohan could not work in a touring theatre company is sufficient to establish Rohan's disability under 42 U.S.C. § 12102(2)(C). We think it is not. That Networks regarded her as unable to withstand the stress of the tour means simply that it perceived her as limited only "in the ability to perform a particular facet of a particular job." *Hooven–Lewis v. Caldera,* 249 F.3d 259, 267 (4th Cir.2001). In *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986), the plaintiff, who suffered from acrophobia, was discharged because his job as a utility systems repairer required some work at heights. *Id.* at 935. We held that he was not substantially limited because, although this particular job required him to work from heights, he had no difficulty obtaining similar jobs that did not require him to climb. *Id.* Similarly, Networks never regarded Rohan as unable to perform as an actress. To the contrary, as Rohan pointed out, Networks acknowledged that Rohan satisfactorily performed her roles on stage. It merely regarded her as unable to withstand the stress of traveling with the production. Moreover, Rohan had previously performed without difficulty in musical productions that did

not require travel, a fact known to Networks. Thus, Rohan has not demonstrated that Networks regarded her impairment as "foreclos[ing] generally the type of employment involved." *Id.* Consequently, Rohan is not disabled under 42 U.S.C. § 12102(2)(C).

Because Rohan has failed to demonstrate that she is substantially limited in a major life activity, or that Networks regarded her as substantially limited, she is not within the ADA's protected class. As such, she cannot state a claim under the ADA. An employer "is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 490, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). On this basis, we affirm the district court's grant of summary judgment to Networks on Rohan's ADA claims. Although this holding precludes Rohan's ADA claims, we nevertheless address the district court's finding that Rohan was not a qualified individual. We do so because of what might otherwise appear to be incongruence between our finding that Rohan was not substantially limited in her ability to interact with others, and the district court's finding that Rohan could not fulfill what it regarded as the essential function of interacting with others.

### B.

To establish that she is a "qualified individual," Rohan had to show that she could "perform the essential functions of her

**21.** *See* J.A. at 44 (explaining Vander Ploeg's view that the "erratic touring schedule seems to be causing her to become unable to control her episodes and behavior"); J.A. at 127 (admitting "employment . . . was terminated as a result of . . . inability to emotionally sustain the rigors of a traveling show"); J.A. at 613–15 (admitting Networks' belief that Rohan had "considerable difficulty" dealing with stresses of traveling show but also admitting that "Ms. Rohan was generally capable of performing her role"); J.A. at 649 (stating that Pfarrer told Richard Rohan that she believed Rohan "could not handle the environment and the stresses of a traveling theater production").

job." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir.1994) (internal quotations omitted) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993)); *see also* 42 U.S.C. § 12111(8) (defining "qualified"). A job function is essential if it "bear[s] more than a marginal relationship to the job at issue." *Tyndall*, 31 F.3d at 213. The district court determined that social interaction ·was an essential function of Rohan's job as a touring actress.

> Rohan had to interact with other actors and actresses on stage and backstage during rehearsals and performances. Rohan also had to interact with directors and tour managers. Finally, social interaction was necessary on the tour bus and in the hotels between performances.

*Rohan*, slip op. at 6. Although we do not necessarily disagree that interacting with others was an essential function of Rohan's job, we need not address this issue here because, essential or not, Rohan appears to have adequately performed this func-

tion. We will therefore assume, without deciding, that, on this record, interacting with others is an "essential function" within the meaning of 42 U.S.C. § 12111(8).[22]

█ The parties do not dispute that Rohan could interact with others to some extent; the question is whether her problems interacting with others rose to a level that made her unable to "perform" this essential function within the meaning of the ADA. When the question is thus a matter of degree, our case law suggests that a plaintiff fails to perform the essential function only if her failure detrimentally affects the purpose of the employment. *See Tyndall*, 31 F.3d at 213 (finding plaintiff failed to perform essential function of attendance because her absences made her incapable of fulfilling her teaching obligations). Here, during three months of rehearsals and performances, Rohan missed half of one performance because of her impairment, and only after completing her role as "Lady Beaconsfield." Rohan's difficulties interacting with others appear

**22.** Rohan argues that interacting with others cannot be an essential function of her job because Networks stated that the only qualifications for her job are "the ability to fulfill the expectations of the director and the vocal requirements of the particular role," J.A. at 156, and Networks admitted that Rohan adequately performed these functions. Rohan is incorrect. The ADA requires the district court simply to give "consideration ... to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8) (emphasis added). The statute does not require the district court to give the employer's judgment preclusive effect. "[T]he trial court must do more than simply determine whether or not [the plaintiff] meets all of the stipulated requirements of the [employer], but look to what the position [the plaintiff] seeks *actually requires*." *Pandazides v. Va. Bd. of Educ.*, 946 F.2d 345, 348–49 (4th Cir.1991) (emphasis added).

The dissent believes that it is improper for a district court to consider a function· "essential" if that function is neither designated as such by the employer nor "necessary for the performance of other listed functions." *Post* at 286–287· & n. *. We believe the dissent's view is mistaken for two reasons. First, nothing in the statute or the regulations limits a district court's consideration to an employer's list of essential functions. As noted above, the statute explicitly permits courts to look beyond an employer's judgment and does not limit review to some sort of overinclusiveness analysis of an employer's list of essential functions. Second, Rohan's interrogatory requested the "qualifications, skills, knowledge, experience, education and background," J.A. at 156, necessary to perform Rohan's role; it did not request a list or description of the *functions* of Rohan's job as a traveling stage actor or identification of which of those functions were, in Networks' judgment, essential. Consequently, both Rohan and the dissent place undue weight on Networks' response.

not to have impeded her ability to perform her stage role in *Jekyll & Hyde.*

Moreover, there is little evidence in the record suggesting that Rohan did not interact appropriately with Jaeger, Vander Ploeg or Pfarrer, at least until the night preceding her termination. When viewed in a light most favorable to Rohan, the record demonstrates that Rohan was capable of interacting with the director and company managers. Her difficulties rested mainly, if not solely, with interactions offstage with certain cast members. We are unwilling, however, to find that Rohan's difficulties with social interaction in this one, narrow aspect of her job establishes that she could not perform this essential function.

### III.

We next address whether Networks breached its employment agreement with Rohan. Rohan argues that Networks was required to provide thirty days written notice before it could terminate the contract and that Networks breached the contract by failing to do so. Further, Rohan argues that Networks could only terminate the contract without notice if Rohan had breached the contract, and in the event that she did, Networks had to provide notice of the breach and five days to cure. Because Networks failed to provide notice and an opportunity to cure, Rohan asserts that Networks breached the contract when it fired her.

The district court determined that Rohan breached the contract for the same reason that it found her unqualified under the ADA—her difficulty interacting with others prevented her from fulfilling the essential functions of her job. The court also found that Networks was not required

to provide Rohan with notice of *her* breach and an opportunity to cure. According to the district court, the contract provision providing for notice to the breaching party "merely reflects the general common law rule," and that rule contains an exception in the event that the breaching party would be unable to cure the breach. *Rohan,* slip op. at 13. Although this exception was not stated in the contract, the district court found it to be implicitly included. "Therefore, in light of the fact that Rohan's therapist has submitted an affidavit making it clear that Rohan could not cure her inability to interact with others or suicidal behavior within five days, [the notice of breach provision] provided Rohan with no protection." *Id.* (citation omitted).[23] We review the district court's interpretation of a contract *de novo. Williams v. Prof'l Transp. Inc.,* 294 F.3d 607, 613 (4th Cir.2002).

Rohan's employment contract permits either party to terminate the agreement, "either unilaterally or bilaterally, without penalty, ... upon thirty (30) days written notice to the other party." J.A. at 14. If Rohan committed a *material* breach of the contract, Networks was not required to provide the thirty-day notice. However, [n]o party to this Agreement shall be deemed to have breached any provisions hereof, unless and until the other party hereto has sent written notice to said party specifying said party's failure in respect of any provision, and said failure is not corrected or rectified within five (5) business days after party's receipt of such written notice from the other party." J.A. at 16. Thus, Rohan could not commit a breach of contract—material or otherwise—until Networks provided notice of the breach and five days to cure.

23. The district court applied Maryland law to interpret the contract. Because the parties do not dispute this decision, we also apply Maryland law.

The district court's determination that Rohan breached her employment agreement is problematic for several reasons. First, as we have already explained, we disagree with the district court's determination that Rohan was unable to interact with others to an extent that would make her unqualified under the ADA. Because this determination was the basis for the district court's ruling on Rohan's breach of contract claim, we cannot agree that Rohan breached her employment agreement. Moreover, Networks has *never* asserted that Rohan breached the contract, let alone that Rohan *materially* breached it. Networks maintains that Rohan resigned, not that she breached her contract.[24]

Second, even if Rohan did violate some unspecified provision, by the express terms of the contract, that violation would not constitute a breach until Rohan failed to cure the problem within five days of receiving notice of the problem. The district court should not have read into the contract an implied exception to the notice-and-cure provision. Under Maryland law, "it is improper for the court to rewrite the terms of a contract for the parties where the terms of the contract are clear and unambiguous." *Maryland Dep't of Econ. & Cmty. Dev. v. Attman/Glazer P.B. Co.*, 323 Md. 592, 594 A.2d 138, 146 (1991). The district court did not find that this provision was ambiguous; it merely determined that it was incomplete. It was not entitled to make that determination.

Third, the district court's assumption, without explanation, that Rohan's inability to interact with others was a material breach of the contract implies that a failure to perform an "essential function" of a job under 42 U.S.C. § 12111(8) is *necessarily* a breach of an employment agreement. We do not believe this to be the case. A breach of contract claim depends on the terms of the contract; whether an employee is a "qualified individual with a disability" does not. Certainly there may be a correlation between the terms of an employment agreement and the essential functions of the position created thereby. But to determine that an inability to perform an essential function is a breach of the agreement requires a district court to first establish that correlation. Here, the district court failed to do so.

Under Rohan's employment agreement, Networks could only terminate her without the required thirty-day written notice if it determined that Rohan's breach was material. Neither Networks nor the district court has explained which contractual obligation Rohan breached as a result of her inability to interact with others. The district court also failed to explain how Rohan's purported breach was material. Thus, we find the district court's reasoning on this point to be in error.

■ Nevertheless, we conclude that Networks did not breach the employment contract. Although Networks was contractually required to provide Rohan with written notice thirty days prior to terminating the contract,[25] and it apparently

---

**24.** Networks' counsel apparently does not understand the standard applied to motions for summary judgment under Rule 56. His assertion that Rohan resigned is wholly unsupported by the record and, quite frankly, baffling. Both Vander Ploeg and Pfarrer stated in their affidavits that Networks had determined to release Rohan from her contract *before* Vander Ploeg flew to Florida to meet with Rohan. As explained below, Rohan's

desire to leave the show on December 6 was contingent upon Networks' decision to terminate her. At best, Rohan's statements create a genuine issue of material fact that would defeat Networks' summary judgment motion.

**25.** The district court noted that the notice-and-cure provision ("¶ 27") could be superceded by the material breach exception ("¶ 21:3") to the termination clause ("¶ 21").

intended to breach that provision by firing Rohan on December 6, Rohan preempted its attempt to do so. Before Vander Ploeg or Pfarrer could fire her, Rohan repeatedly told Vander Ploeg on the phone that "[i]f it's the company's intention to let me go at the layoff, I want to go home tomorrow morning and not stay for the remainder of the next two weeks." J.A. at 45, 287. When Vander Ploeg and Pfarrer went to Rohan's room later that night, they found her crying and packing her belongings in anticipation of leaving. Rohan was entitled to written notice thirty days before termination, but she was also entitled to waive that requirement. *See Twining v. Nat'l Mortgage Corp.*, 268 Md. 549, 302 A.2d 604, 607 (1973) ("[I]t is elementary that either party to a contract may waive any of the provisions made for his benefit."); *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md.App. 116, 801 A.2d 1104, 1116 (2002) ("A waiver ... may result from an express agreement or be inferred from the circumstances," but "will not be inferred from equivocal acts or language.") (internal quotations omitted). Because Rohan clearly waived the notice requirement by announcing her desire to depart the cast immediately if Networks intended to terminate her, Networks did not breach the contract.[26]

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

SHEDD, Circuit Judge, dissenting:

I agree with the majority that the district court's analysis does not support summary judgment for Networks. Indeed, the district court candidly recognized that its analysis was strained. Equally strained, however, is the majority's effort to affirm the district court's judgment on the alternative grounds it describes. Considering the evidence that Rohan produced in light of well-established standards governing summary judgment, I would hold that summary judgment is not appropriate on any of Rohan's claims at this point in the litigation. Rohan might not prevail after further discovery or at trial, but because she is entitled to go forward on the record as we have it, I respectfully dissent.

I.

In order to invoke the protections of the Americans With Disabilities Act ("ADA"), a plaintiff must prove that she is a "qualified individual with a disability." 42 U.S.C. § 12112(a). A person has a "dis-

*Rohan*, slip op. at 13 n. 11. However, ¶ 27 governs *any* breach, including material breaches under ¶ 21.3. Thus, before Rohan could be deemed to be in material breach warranting termination without the thirty-day written notice, Networks would have to inform Rohan of her breach, in writing, and wait for the cure period to pass. The "without notice" language in ¶ 21.3 properly applies only to the thirty-day notice requirement of ¶ 21.1.

26. Our dissenting colleague disagrees with our reasoning with regard to this claim only because we raise the issue of waiver *sua sponte*. *Post* at 287–288. However, Networks *did* raise the affirmative defense of waiver in its answer. J.A. at 16. Moreover, there is no dispute as to the factual basis of the defense—Rohan conceded during her deposition that she told Pfarrer and Vander Ploeg she wanted to leave immediately were they to fire her—and Networks has relied on Rohan's statements throughout these proceedings. Because Networks pled waiver in its answer, and because the factual predicate for the defense was raised by the parties, we believe it is appropriate to rely on waiver to affirm the district court. *Cf. Jones v. Miles*, 656 F.2d 103, 107 n. 7 (5th Cir. Unit B Aug.1981) ("[A]n affirmative defense is not waived to the extent ... that the opposing party's own evidence discloses the defense.").

ability" if she has a physical or mental impairment that substantially limits a major life activity. *Id.* § 12102(2). The record establishes that Rohan had mental impairments—posttraumatic stress disorder ("PTSD") and severe depression—and along with the majority, *ante* at 274, I assume social interaction to be a major life activity. In order for Rohan to be deemed disabled, then, she must show that her PTSD and severe depression substantially limit her ability to interact with others. The majority says Rohan has not made this showing. I cannot agree.

A person is substantially limited in a major life activity if she is "unable to perform" that activity or if she is "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). In assessing the degree of an impairment's limitation on a major life activity, we must consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact, of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Rohan produced testimony from her treating mental health professionals that speaks to each of these factors. Mary Sheahen, a licensed clinical social worker who had given Rohan more than 220 hours of therapy over a period of more than five years (including the period of Rohan's employment with Networks), submitted a comprehensive declaration describing Rohan's condition and its effects on her ability to interact with others. Following are relevant excerpts from Sheahen's declaration:

> [Tess Rohan] avoids interaction with her family of origin; avoids making friends;

avoids social situations and mixing with people not associated with work; avoids men (including at work) who remind her of her father or her life as his daughter; when at home she avoids answering the telephone and door; avoids undertaking simple errands in public places, such as grocery shopping; and avoids changing clothes, bathing, being naked, and leaving the house on days when she does not have to go to work. Tess attempts to gain a sense of safety and control of her life by withdrawing from other people and avoiding social situations in general.

> Tess anxiously avoids certain types of situations, such as a parent scolding his child, children screaming or crying, and situations involving a display of anger. Although Tess has flashbacks and abreactions in which she recalls and reexperiences certain parts of the molestation, she cannot recall other parts of it, and is very afraid of having more memories of the abuse. Tess feels detached and estranged from people in general and the community at large. She has no close friends. Although she is pleasant with the people with whom she works, she does not pursue a social relationship with anyone. Tess isolates herself generally from others and the community and interacts with others only to the extent necessary to do her work properly.

> . . .

> For the past several years, Tess's depression and PTSD have imposed significant limitations on her ability to interact with others in normal fashion as compared to the average person in the general population. Some of these behaviors have been described. Tess has isolated herself from others and the community at large. She avoids interaction with her parents and siblings. She avoids making friends and makes no ef-

fort to have a social life. She has a fear of relationships. She has severe difficulties in interacting with men, and such interactions often trigger flashbacks or abreactions of the earlier abuse. Tess also has substantial difficulties in interacting with certain types of women, especially strong, authoritative women. She has substantial difficulty asserting herself with someone (man or woman) whom she perceives as an authority figure.

As noted, Tess's interactions with others, particularly with men and with others who display anger either towards her or others, often trigger flashbacks or abreactions of her earlier molestation. When Tess experiences a flashback or abreaction, her behavior is visibly abnormal and her ability to interact with others is significantly impaired. During certain flashbacks or abreactions, Tess becomes child-like, sometimes curls up in a fetal position, and talks like a child. Sometimes, the reaction is milder and she stares off into space. During other flashbacks and abreactions, Tess hyperventilates, cannot speak, cannot open her eyes, and gags.

When Tess has a flashback or abreaction, it is important that no one touch her without permission, or else she becomes even more frightened. At these times, the best thing to do is to talk to her, to remind her where she is and when it is, that she is safe, and that she is an adult now, and by gently talking to her, bring her back to the present.

... *I wish to emphasize that Tess's depression and PTSD are not mild, not temporary, not minor, and not short term. Her impairments are severe, chronic, long term, and deeply rooted in an earlier traumatic event. Her impairments have imposed, and will impose for some time, significant limitations on her social and personal functioning, especially her ability to interact with and trust others.*

J.A. 624–27 (emphasis added). Sheahen's description of Rohan's condition is corroborated by Dr. David Irwin, Rohan's treating psychiatrist since 1998. J.A. 634–35. This testimony—from mental health professionals familiar with Rohan's particular condition—at least creates genuine issues of material fact concerning the nature and severity of Rohan's impairments; the duration or expected duration of her impairments; and the permanent or long-term impact of her impairments on her ability to interact with others. *See* 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Further, I agree with the district court that this testimony is "corroborated by Rohan's recurring episodes, conflicts with other members of the cast, and suicidal tendencies." J.A. 661. Indeed, the record shows clearly that Rohan's PTSD and severe depression resulted in behaviors that significantly impaired her relations with coworkers. Gretchen Pfarrer, company manager for *Jekyll & Hyde,* described no fewer than thirty-three separate episodes during the period of Rohan's employment, from late August 2000 to early December 2000. J.A. 48–58. According to Pfarrer, these episodes occurred nearly every week; over one weekend in November, Pfarrer counted fifteen distinct episodes. J.A. 52–54. This evidence undermines the majority's assertion that Rohan's episodes were merely "[i]ntermittent manifestations" of her condition, *ante* at 276, at least sufficiently to preclude summary judgment for Networks based upon the frequency of Rohan's episodes.

Pfarrer described not only the frequency of Rohan's episodes but also the nature of Rohan's conduct during those episodes:

[August:] Ms. Rohan was sitting at the piano with the rehearsal pianist, tears

streaming down her cheeks; Jenn Lyons came into the office to ask me to help Ms. Rohan.... She started hysterically crying and telling me to stop, please stop. At that point she seemed to be in a child like state and started to hit me. J.A. 48.

[September:] [D]uring one afternoon in the dressing room she had an extreme episode. She was laying in a fetal position, screaming at the top of her lungs "no daddy no" in a child-like voice. When she started to come out of the episode she saw another [a]ctor on the tour, David Grimes, and went directly into another episode. At this point most of the ensemble cast was standing around very concerned with her state. J.A. 49.

[September:] During the run-through of the show, Ms. Rohan sat at the side of the stage in a trance. I was called to the stage by several company members to speak to her and get her focused on the performance and the show. J.A. 50.

[September:] During the bus ride from Champaign IL to Winston–Salem, NC was Ms. Rohan's first bus episode.... During the movie I heard a child-like crying from the back of the bus. At this moment I ran back to check on Ms. Rohan; she was in a screaming fit.... During this time, her roommate came to me and stated that she was beginning to have problems with [Rohan's] nightmares and also that she felt like she was not allowed to bring people to her room, because of Ms. Rohan. J.A. 50.

[October:] Ms. Rohan's roommate came to my room to spend the night, because the episodes during the evening were too much for her to handle. J.A. 51.

[October:] Small and controllable episode upon waking up from quiet hour. Just a bit of child-like jabber and again with the crying. Some of the cast is getting concerned because she is having the episodes more often, almost daily during the bus travel, and it is becoming disruptive to the company. J.A. 52.

[October:] Later that day, Allison came to me about a screaming fit during the previous night. She stated that it was one of the worst nightmares she experienced with Ms. Rohan and had a difficult time getting Ms. Rohan to respond and calm down. J.A. 52.

[November:] At 15–minute call to the evening performance, Rana, her dressing roommate, came and got Janine and myself because Ms. Rohan was crying hysterically under her dressing table.... That evening the wardrobe mistress, Jennifer Carrol and I found Ms. Rohan under her dressing table again. We talked to her and she kept saying that two of the company members were mad at her and she was going to get in trouble from "daddy." J.A. 53–54.

[November:] During the long travel days we tend to watch several movies. The movie choice for the day was "American Beauty." ... [Rohan] opted not to watch the movie and put her headphones on to sleep. Upon waking, there was a scene in the movie when an older man was making advances to a young girl. This upset her so much, that we had a rather difficult time getting her out of the episode as she was speaking loudly and was uncontrollable. With this disruption, we quickly changed the movie to "Uncle Buck," a comedy. Later a few of the cast members voiced concern that we now had to "censor" our movie choices on the bus to accommodate Ms. Rohan's condition. J.A. 54.

Pfarrer's affidavit thus describes highly unusual behavior that significantly disrupted Rohan's relations with her coworkers.

Finally, the record reflects expressions of suicidal tendencies by Rohan. On October 11, 2000, Rohan purposely cut her left wrist with a coworker's dull razor, because she "just wanted to bleed." J.A. 251. On November 17, 2000, Rohan told her director that she was bored with her part in the show, she was feeling suicidal, and she had taken extra medication. J.A. 267–68. (Pfarrer recounted that Rohan had tried to kill herself because she was upset with the director's "nit-picky" criticisms of her performance, criticisms that reminded her of "daddy." J.A. 53.) Then on December 1, 2000, Rohan announced during a bus ride that she did not feel like living anymore; one of Networks' managers stopped the tour bus so Rohan could call her therapist for an impromptu session. J.A. 56, 236–37.

All of this evidence, taken in the light most favorable to Rohan, corroborates the testimony from Sheahen and Dr. Irwin and compels the conclusion that Rohan's case should survive summary judgment on the question whether she was disabled under the ADA. This evidence at least creates a genuine issue of material fact concerning the degree of the limitation on Rohan's ability to interact with others when compared with the average person in the general population. *See* 29 C.F.R. § 1630.2(j).

In holding that Rohan was not disabled, the majority discounts the substantial testimony of Sheahen and Dr. Irwin with no explanation, understates the frequency and severity of Rohan's episodes, and suggests alternative explanations for Rohan's plainly abnormal behavior. In short, the majority weighs the evidence, makes credibility determinations, and denies Rohan the benefit of the evidence that favors her claim. This kind of analysis is inappropriate at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Taking the evidence in the light most favorable to Rohan—as we must on summary judgment—Rohan has established that she has a "disability" under the ADA.

## II.

Further, Rohan has established, at least sufficiently to survive summary judgment, that she is a "qualified individual with a disability," *i.e.,* that she was able to perform the essential functions of her job with or without reasonable accommodation. 42 U.S.C. § 12111(8). Rohan produced evidence showing that Networks consistently gave her excellent reviews for her performance in *Jekyll & Hyde.*

The district court rejected Rohan's claim on the ground that social interaction was an "essential function" of the job that Rohan could not perform. Yet Networks never suggested to Rohan—or even to the district court—that it considered social interaction an "essential function" of Rohan's job. Perhaps Networks should have suggested as much, but it never did. Rather, in its answer to Rohan's complaint Networks admitted that "Plaintiff could perform, and did perform, the essential functions of the role of Lady Beaconsfield/Ensemble in Networks's *Jekyll & Hyde* production." J.A. 146, 177. Likewise, in response to an interrogatory requiring Networks to "set forth a complete description of the qualifications, skills, knowledge, experience, education and background" necessary to perform Rohan's role, Net-works answered that "[k]nowledge, experience and education back-ground are not requirements for casting. The qualifications necessary for a performing artist are the ability to fulfill the expectations of the director and the vocal requirements of the particular role." J.A. 156. When Networks reviewed Rohan's job performance, it evaluated her with respect to these requirements; signif-

icantly, Networks never suggested to Rohan that her episodes or other abnormal behaviors compromised her work. On the record before us, there is at least a jury question whether Rohan performed the essential functions of her job.

It was not appropriate for the district court to declare, for the first time, that social interaction is an "essential function" of Rohan's job. In defense of this analysis, the majority cites *Pandazides v. Virginia Board of Education,* 946 F.2d 345 (4th Cir.1991), for the proposition that a court is not bound by an employer's statement of the essential functions for a particular job. *Ante* at 279 n. 22. Although the statute requires consideration of "the employer's judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8), courts are entitled to consider other evidence as well, 29 C.F.R. § 1630.2(n)(3). It is especially important to look beyond the employer's judgment in cases such as *Pandazides,* where the employer's requirements are arguably overinclusive with respect to the functions of the job that are truly essential. Less clear, however, is the propriety of a court's denominating as "essential" functions that the employer never thought so important, even in litigation.*

In this case, Rohan produced evidence showing that she performed all of the functions deemed essential by Networks, and did so very well. At the very least, it is for the jury to decide whether Rohan was able to perform the essential functions of her job and was therefore a "qualified individual with a disability" covered by the ADA.

---

* Supplementing the employer's list of essential functions might be appropriate where functions not listed by the employer are nevertheless essential because they are necessary for the performance of other listed functions. *See, e.g., Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir.1994) (holding that

### III.

Finally, I must disagree with the majority's holding that summary judgment for Networks was proper on Rohan's contract claim. Rohan alleged that Networks breached her employment contract by terminating her employment without notice. There is a factual dispute concerning Rohan's leaving Networks: Rohan says she was fired, while Networks says she left voluntarily. As the district court properly concluded, that question is for the jury to decide. It is undisputed that Networks never gave Rohan notice of any termination. Thus, the question is whether the contract permitted Networks to terminate Rohan without notice.

As a general matter, the contract requires that any party wishing to terminate the contract must give the other party thirty days' notice before doing so. Paragraph 21.[4] provides, however, that Networks could terminate Rohan without notice if Rohan materially breached the contract. Under Paragraph 27 of the contract, Rohan could only be deemed guilty of a material breach if Networks gave her notice and an opportunity to cure such a breach. It is undisputed that Networks never gave Rohan notice of any alleged breach, and the evidence does not support any finding that she actually breached the contract. To the contrary, all of the evidence suggests that Rohan fully satisfied her obligations to Networks.

The majority dispatches Rohan's contract claim on the ground that she waived the protection of the thirty-day notice provision. *Ante* at 281–282. Although Net-

attendance is an essential function of any job). Nothing in this record suggests that social interaction was necessary for the performance of the functions that Networks deemed essential. Indeed, Networks acknowledged that Rohan consistently performed those functions very well despite her condition.

works asserted waiver (among other standard contract defenses) in its answer, it did not move for summary judgment on that legal theory or otherwise argue that theory to the district court. Nor did Networks argue waiver in its briefing to this Court, nor did the issue even arise at oral argument. In sum, the majority affirms summary judgment for Networks on a ground that neither Networks nor Rohan had any reason to believe might dispose of the contract claim. *See Peters v. Jenney,* 327 F.3d 307, 320 (4th Cir.2003) (stating that "we will not ordinarily affirm summary judgment on grounds raised by an appellee for the first time on appeal, where the parties were not afforded an opportunity to develop the issue below ... so that the [nonmoving] party was not on notice of the need to meet it").

## IV.

In affirming the judgment entered below, the majority characterizes the factual record in the light most favorable to Networks rather than Rohan; disregards what is perhaps the best evidence available concerning Rohan's disability; and grants Networks the benefit of legal arguments never advanced by the district court or even Networks itself. In short, the majority casts aside the well-established standards governing summary judgment and merely substitutes one unsatisfying analysis for another. Accordingly, I dissent.