**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA ex rel.
DRC, INCORPORATED, ex rel.
ROBERT J. ISAKSON; WILLIAM D.
BALDWIN,

        *Plaintiffs-Appellants,*

        v.

CUSTER BATTLES, LLC; SECURE
GLOBAL DISTRIBUTION, a resident of
Lebanon; MIDDLE EAST LEASING, a
Cayman Islands entity; CUSTER
BATTLES LEVANT, a Lebanese
entity; SCOTT CUSTER, County of
Fairfax, Virginia; MICHAEL
BATTLES, State of Rhode Island;
JOSEPH MORRIS,

        *Defendants-Appellees,*

        and

MURTAZA LAKHANI, a citizen of
Pakistan who resides in Canada
and Iraq; LARU, LIMITED;
MOHAMMED ISSAM ABU DARWISH, a
citizen of Lebanon who resides in
Lebanon and Iraq,

        *Defendants.*

No. 07-1220

TAXPAYERS FOR COMMON SENSE;
TAXPAYERS AGAINST FRAUD
EDUCATION FUND; UNITED STATES OF
AMERICA,

    *Amici Supporting Appellants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:04-cv-00199)

Argued: December 5, 2008

Decided: April 10, 2009

Before NIEMEYER, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed in part, reversed in part, and remanded for further proceedings by published opinion. Judge Niemeyer wrote the opinion, in which Judge Shedd and Judge Duncan joined.

## COUNSEL

**ARGUED:** Douglas Neal Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the United States of America, Amicus Supporting Appellants; Alan Mark Grayson, GRAYSON & KUBLI, P.C., Vienna, Virginia, for Appellants. Barbara Van Gelder, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C.; Robert Thomas Rhoad, CROWELL & MORING, L.L.P., Washing-

ton, D.C., for Appellees. **ON BRIEF:** Victor A. Kubli, GRAYSON & KUBLI, P.C., Vienna, Virginia, for Appellants. Salvatore A. Romano, PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P., Washington, D.C., for Appellees Custer Battles, LLC, Secure Global Distribution, a resident of Lebanon, Middle East Leasing, a Cayman Islands entity, Custer Battles Levant, a Lebanese entity, Scott Custer, County of Fairfax, Virginia, and Michael Battles, State of Rhode Island; Andrew M. Miller, WILEY REIN, L.L.P., Washington, D.C., for Appellee Joseph Morris. Daniel Schumack, SCHUMACK RYALS, P.L.L.C., Fairfax, Virginia, for Taxpayers for Common Sense, Amicus Supporting Appellants. James W. Moorman, Joseph E. B. White, TAXPAYERS AGAINST FRAUD EDUCATION FUND, Washington, D.C., for Taxpayers Against Fraud Education Fund, Amicus Supporting Appellants. Peter D. Keisler, Assistant Attorney General, Scott R. McIntosh, Attorney, Appellate Staff, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Chuck Rosenberg, United States Attorney, Alexandria, Virginia, for the United States of America, Amicus Supporting Appellants.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this *qui tam* action,* the relators, on behalf of the United States, alleged fraud perpetrated by Custer Battles, LLC, in making fraudulent statements or submitting fraudulent invoices on two contracts entered into in 2003 with the Coalition Provisional Authority in Iraq, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3732. The Coalition Provisional Authority was a temporary governing body that was created by U.S. General Tommy Franks, the Commander of

---

*A *qui tam* action is one filed not only for the benefit of the plaintiffs but also as relators for the benefit of the state, here the United States. *See* 31 U.S.C. § 3730(b)-(d).

Coalition Forces, and recognized by a United Nations Security Council resolution. It was staffed by personnel mostly from the United States but also from over a dozen countries, and it governed Iraq from May 2003 to June 2004.

The district court limited the relators' fraud claim in connection with the first contract to a claim for $3 million, which was the amount paid to Custer Battles with a United States Treasury check and, as so limited, submitted the claims to the jury. After the jury found Custer Battles liable for fraud and returned a verdict of $3 million against it, the district court granted Custer Battles' earlier-filed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on the ground that the evidence was insufficient to demonstrate that Custer Battles "presented" the fraudulent invoices to "an officer or employee of the United States Government or a member of the Armed Forces of the United States," as required by the False Claims Act.

On the fraud claim made in connection with the second contract, the court did not submit the claim to the jury but instead granted Custer Battles' motion for summary judgment. The court found that the relators' evidence was insufficient to demonstrate any fraud.

On appeal, the relators, supported by the United States as amicus curiae, contend that the district court erred (1) in limiting the applicability of the False Claims Act to a claim for funds paid from the United States Treasury; (2) in concluding that U.S. government personnel detailed to the Coalition Provisional Authority were not "officer[s] or employee[s] of the United States government" for purposes of the False Claims Act; and (3) in granting summary judgment in favor of Custer Battles on the fraud claim alleged in connection with the second contract.

For the reasons that follow, we reverse the district court's order limiting the relators' claim on the first contract to $3

million; we reverse its order granting Custer Battles' Rule 50(a) motion because substantial evidence was presented that the persons at the Coalition Provisional Authority, to whom the fraudulent invoices on the first contract were presented and who processed and approved them, were United States personnel detailed to the Coalition Provisional Authority as part of their official duties; and we affirm the district court's summary judgment on the claim made in connection with the second contract. Accordingly, we remand this case for further proceedings consistent with this opinion.

I

The Coalition Provisional Authority in Iraq ("Coalition Authority") governed Iraq from May 2003 to June 28, 2004, when it turned over governing authority to the Interim Government of Iraq. The Coalition Authority's administrator, L. Paul Bremer, was appointed by the U.S. President and the U.S. Secretary of Defense, and the large majority of the Coalition Authority's personnel were either U.S. civilian contractors and employees or in the U.S. Military. The remainder of the Coalition Authority's personnel were from other countries in the coalition occupying Iraq, including Australia, the Czech Republic, Denmark, Italy, Japan, Poland, Romania, Spain, the United Kingdom, Ukraine, and others.

At the time of the Coalition Authority's formation, the Iraqi currency, the dinar, bore the portrait of Saddam Hussein, the deposed ruler of Iraq. In early July 2003, Administrator Bremer announced an initiative to replace all of these dinars with a new dinar that would not bear Saddam Hussein's portrait. The exchange was a massive undertaking. The new dinars were shipped into Iraq on 28 fully-loaded Boeing 747 cargo planes, and the exchange required the services of multiple contractors, ranging from providers of currency-counting machines to transportation providers.

To build, equip, and service three hubs of the dinar exchange program—to be located in Baghdad, Mosul, and

Basra—the Coalition Authority entered into a contract (the "Dinar Exchange Contract") on August 27, 2003, with Custer Battles, LLC. Custer Battles was founded, managed, and owned by two former U.S. Army Rangers, Scott Custer and Michael Battles, and described itself as a "leading international risk management firm with extensive experience assisting large organizations reduce and manage risk in extremely volatile environments." As of 2003, it had "offices in Washington, DC, New York City, Newport, Las Vegas, Amman and Kuwait City" and claimed that it had "assembled an international team with an unparalleled level of experience, training and success in managing risk and providing specialized security solutions."

The Dinar Exchange Contract was a cost-plus contract, meaning that Custer Battles would be reimbursed for its actual expenses, plus 25% of its actual expenses to cover overhead and provide a profit. On the day the contract was signed, the Coalition Authority paid Custer Battles an advance of $3 million. Although the Coalition Authority was funded from multiple sources, it paid Custer Battles the $3-million advance with a U.S. Treasury check funded by its "seized assets" account, consisting of assets seized from Iraqi government sources as part of the war effort. The check was signed by a lieutenant colonel in the U.S. Military. The invoices that Custer Battles thereafter submitted under the contract, however, were paid from the Coalition Authority's "Development Fund for Iraq," which was recognized by United Nations Security Council Resolution 1483 and included funds from various non-U.S. sources but also included $210 million confiscated by the United States from Iraqi bank accounts and transferred to the Development Fund, as well as funds appropriated by Congress.

During the course of Custer Battles' performance of the Dinar Exchange Contract, which began in August 2003 and continued to early 2004, Custer Battles submitted invoices for payment to U.S. personnel who were detailed to work with

the Coalition Authority. Specifically, the invoices were typically submitted to Patricia Logsdon, a U.S. government employee detailed to the Coalition Authority, who then forwarded the invoices to a U.S.-retained contractor and U.S. Military personnel for approval and ultimately to the finance office of the Coalition Authority for payment. The invoices were paid from the Development Fund usually by wire transfers or with "bricks" of cash. Under this practice, Custer Battles was paid approximately $12 million in addition to the $3 million initially advanced, for a total of approximately $15 million.

Problems developed with the quality of Custer Battles' performance, leading to a meeting on October 18, 2003, between representatives of the Coalition Authority, the U.S. Military, and Custer Battles' co-owners Michael Battles and Scott Custer. After this meeting ended, Battles accidentally left behind an astonishing spreadsheet, which contained rows listing items invoiced under the Dinar Exchange Contract and separate columns listing the "Actual Cost" for the items and the amounts "Invoiced" for the items. This document showed, for example, that for the Baghdad hub of the dinar exchange program, Custer Battles provided two flatbed trucks, for which it paid $18,000 but invoiced the Coalition Authority $80,000. To provide "Life Support, basic level" at the Bagdad hub, it provided generators that cost $74,000 but for which it invoiced the Coalition Authority $400,000. And for the Basra hub, it spent $4,000 to provide laundry facilities but invoiced the Coalition Authority for $12,000. Thus under the Dinar Exchange Contract, Custer Battles improperly received the difference between the actual costs and the inflated invoiced amounts and also 25% of the inflated invoiced amounts.

In addition to the Dinar Exchange Contract, the Coalition Authority entered into a separate contract with Custer Battles for the provision of security at the Baghdad International Airport (the "Airport Contract"). As Coalition Authority officials were determined to open the airport for commercial flights as

soon as possible, its Ministry of Transportation issued a request for proposals on June 19, 2003, defining the security requirements primarily in terms of opening the airport promptly rather than in terms of a specific number of security personnel needed. Custer Battles submitted a comprehensive proposal five days later, which included the provision of armed patrols and checkpoints, an airport police force, and baggage screeners certified by the U.S. Transportation Security Administration. The proposal's initial cost estimate of approximately $13.6 million was based partly on the salaries of 138.5 personnel.

Because Custer Battles' proposal was not only the lowest bid but also the only one addressing the Coalition Authority's demanding timetable for opening the airport to commercial traffic, the Coalition Authority accepted Custer Battles' proposal. On July 1, 2003, it entered into a one-month temporary "Letter Contract" with Custer Battles, and Custer Battles began performing security services for the Baghdad International Airport that same day. On July 31, 2003, the Letter Contract was extended by another month in an "Extended Letter Contract." Not until August 31, 2003 did the Coalition Authority and Custer Battles enter into a "Final Contract," which covered the next ten months, ending June 30, 2004.

The Airport Contract was "a firm-fixed price" contract in the amount of $16,840,832. As a result of the fixed-price structure, Custer Battles did not include the cost of personnel as part of the invoices submitted to receive payment, but rather received advances and subsequent monthly fees, as specified in the contract. Neither the request for proposal nor the contract itself specified a fixed number of personnel to perform the contract, but at least at the start, Custer Battles provided more than 138 personnel, a number that fluctuated thereafter as needs changed.

Custer Battles received high marks for its performance of the Airport Contract, and the Coalition Authority's Minister

of Transportation, Franklin D. Hatfield, found Custer Battles performance, "far above and beyond what was required" by the Contract.

DRC, Incorporated, a "leading provider of post-conflict management services, with considerable experience and contacts throughout the Middle East," acted as a subcontractor on Custer Battles' contracts in Iraq, and Robert Isakson was DRC's managing director. Based on their belief that Custer Battles defrauded the United States, DRC and Isakson, acting as relators under the False Claims Act, commenced this action against Custer Battles, its subsidiaries, related entities, and employees (collectively hereafter, "Custer Battles"), claiming that Custer Battles submitted inflated invoices to the Coalition Authority and that it understaffed its Airport Contracts by not providing a consistent level of at least 138.5 persons, in violation of the False Claims Act. In addition, William Baldwin, a former Custer Battles employee, claimed that he was discharged in retaliation for his whistleblowing activity in connection with the contracts.

In Count I of their amended complaint, the relators alleged that Custer Battles knowingly presented to a U.S. government official false claims for both the Dinar Exchange Contract and the Airport Contract, in violation of 31 U.S.C. § 3729(a)(1). In Count II, they alleged that Custer Battles knowingly made or caused to be made "false records in the form of altered Purchase Orders or invoices, receipts, wire transfer reports, or the like, in an effort to ensure that the false claims for payment submitted to the [Coalition Authority] for the [Dinar Exchange] contract would be paid," in violation of 31 U.S.C. § 3729(a)(2). In Count III, they alleged a conspiracy among the defendants to defraud the United States under the Dinar Exchange Contract, in violation of 31 U.S.C. § 3729(a)(3). And in Count IV, they alleged that the relator Baldwin had been discharged in retaliation for his "efforts to investigate the Defendants' fraud," in violation of 31 U.S.C. § 3730(h).

Although the United States was provided notice of the complaint, in accordance with 31 U.S.C. § 3730(b)(2), it declined to intervene in the case. Nonetheless, it filed numerous briefs in the district court as amicus curiae, supporting the relators. It also submitted an amicus curiae brief to this court and participated in oral argument.

On Custer Battles' motion for summary judgment, the district court granted the motion in part. *See United States ex rel. DRC, Inc. v. Custer Battles, LLC* ("*DRC I*"), 376 F. Supp. 2d 617 (E.D. Va. 2005). It dismissed Count III, which alleged a conspiracy under § 3729(a)(3) because "[e]very defendant named in the complaint in addition to Custer Battles itself is an employee of Custer Battles, a related entity or subsidiary . . . . Thus a conspiracy among the defendants is a 'legal impossibility.'" *Id.* at 651 (quoting *Marmott v. Md. Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986)). It also limited the relators' claims in Counts I and II, finding that Custer Battles' liability for damages under the Dinar Exchange Contract was limited to a claim for $3 million. *Id.* at 649. It reached this conclusion after conducting a thorough source-of-funds analysis, concluding that of the approximately $15 million paid on the Dinar Exchange Contract, only the $3-million advance came from U.S. government funds. *Id.* at 641-49.

The district court thereafter severed the Dinar Exchange Contract and retaliation claims from the Airport Contract claim and proceeded to trial on the Dinar Exchange Contract and retaliation claims. The jury returned a verdict in favor of the relators, finding all of the defendants liable under both § 3729(a)(1) and § 3729(a)(2), regardless of whether the Coalition Authority was or was not a U.S. government instrumentality. And the jury found the maximum amount of damages allowed by the district court—$3 million. In addition, the jury awarded Baldwin $165,000 in damages for Custer Battles' retaliation against his whistleblowing.

Before entering judgment on the verdict, the district court considered Custer Battles' motion for judgment as a matter of

law under Federal Rule of Civil Procedure 50(a), filed earlier in the proceedings when the relators had completed the presentation of their case, which the court had deferred, and granted the motion, entering judgment for Custer Battles on Counts I and II. *See United States ex rel. DRC, Inc. v. Custer Battles, LLC* ("*DRC II*"), 444 F. Supp. 2d 678, 692 (E.D. Va. 2006). With respect to claims made under § 3729(a)(1), the court found that the relators did not prove that the invoices were presented to U.S. government employees or officers, as required by that provision, but rather to the Coalition Authority. *Id.* at 683-85. For the same reason, the court granted judgment as a matter of law on the claims under § 3729(a)(2), which the court concluded had an implied requirement that the false record or statement be *presented to* the U.S. government. *Id.* at 685.

With respect to the severed claim on the Airport Contract, Count IV of the complaint, the district court granted Custer Battles' motion for summary judgment. *United States ex rel. DRC, Inc. v. Custer Battles, LLC* ("*DRC III*"), 472 F. Supp. 2d 787, 800 (E.D. Va. 2007). The court concluded that the elements of a false claim had not been fulfilled and rejected the relators' efforts to take the complaint as constructively amended at that late date. *Id.* at 795-96.

The relators now appeal, contending (1) that the district court erred in conducting its source-of-funds analysis that resulted in limiting the relators' claim to a claim for damages of $3 million on the Dinar Exchange Contract; (2) that the relators introduced evidence sufficient to prove that presentment was made to an officer or employee of the United States government under the Dinar Exchange Contract; and (3) that the district court erred in granting summary judgment with respect to the Airport Contract.

## II

The relators contend that the district court "erred in ruling that claims paid ultimately from [the Development Fund for

Iraq] are not actionable under the [False Claims Act]," thereby limiting their claims to a $3-million claim for damages. They argue that the district court's position is not supported by the language of the Act or case law.

The district court made two findings to reach its conclusion that "[r]equests for payment from funds in [the Development Fund] . . . were requests for Iraqi funds and thus did not constitute [a False Claims Act] 'claim.'" *DRC I*, 376 F. Supp. 2d at 647. First, the court found that a "claim" under the False Claims Act is defined in part by the source of funds from which the claim is to be paid:

> In sum, therefore, § 3729(a)(1) requires a "claim," or a request or demand for payment that if paid would result in economic loss to the government fisc, *i.e.* a request for payment from government funds; it does not extend to cases where the government acts solely as a custodian, bailee, or administrator, merely holding or managing property for the benefit of a third party. The significance of this conclusion for this case is that if the funds used to pay the Custer Battles contracts were "Iraqi funds," even if administered or held in the possession of the United States, then the presentment of a fraudulent request for payment from these funds does not constitute a "claim" within the meaning of the [False Claims Act]. On the other hand, if the funds used to pay for the contracts belonged to the United States, then [False Claims Act] liability may attach if Custer Battles knowingly presented a false or fraudulent claim to a United States government officer for payment from these funds. Thus, it is necessary to consider each source of funds separately to determine whether a request for payment therefrom constitutes a "claim."

*Id.* at 641. Second, it found that the United States did not "provide" funds that could determine the scope of a claim if the United States "relinquished control of those funds":

> Yet, once the Vested Funds [U.S. funds] were trans-
> ferred to the [Development Fund for Iraq], the
> United States relinquished control of those funds and
> they ceased to be United States government prop-
> erty. Therefore, the United States did not "*provide*"
> a portion of the money or property requested or
> demanded from the [Development Fund of Iraq].

*Id.* at 646.

In reaching its holdings, the district court conducted a source-of-funds analysis, analyzing each of the four sources of funds used by the Coalition Authority — (1) funds appropriated by Congress and its counterparts in the Coalition countries; (2) "vested funds"; (3) "seized funds"; and (4) "the Development Fund for Iraq." *Id.* at 623. Because the parties agreed that no appropriated funds were used in connection with the Dinar Exchange Contract, the court addressed only the other three funds in its analysis.

It concluded that "vested funds" consisted of Iraqi funds held in bank accounts in the United States that were legally confiscated by Executive Order and thereby became property of the United States government. *See DRC I*, 376 F. Supp. 2d at 624-25, 641-42. It classified as "seized funds" those that were physically located in Iraq but legally confiscated by U.S. and Coalition forces as occupying forces and that also, under the laws and usages of war, became property of the United States government. *Id.* at 626, 642-45. These assets included U.S. dollars, euros, Iraqi bonds, Iraqi dinars, and other property, much of which was found hidden near Saddam Hussein's presidential palaces. *Id.* at 626. Finally, it concluded that the "Development Fund for Iraq" belonged to the Iraqi people. The Development Fund was formally recognized by United Nations Security Council Resolution 1483, and the Coalition Authority had responsibility for administering the Fund during the time that it exercised governmental powers in Iraq. *See* S.C. Res. 1483, ¶¶ 12-14, U.N. Doc. S/RES/1483

(May 22, 2003); *see generally DRC I*, 376 F. Supp. 2d at 629, 645-47. The district court found that although the United States contributed $210 million of its "vested funds" to the Development Fund for Iraq during the summer of 2003, the United States government no longer had title to the $210 million when the Development Fund was used to pay claims submitted under the Dinar Exchange Contract. *See DRC I*, 376 F. Supp. 2d at 625, 646.

Because the $3-million advance made to Custer Battles on the Dinar Exchange Contract was drawn from "seized funds" and the remaining $12 million was drawn from the Development Fund for Iraq, the district court held that of the total payments made under the Dinar Exchange Contract, only the $3-million advance drawn from "seized funds" supported a "claim" under the False Claims Act, and it so instructed the jury.

The relators argue that this was error and that Custer Battles' liability should not have been so limited. They ground their argument on the text of the False Claims Act.

The False Claims Act provides in pertinent part:

Any person who —

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent *claim* for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent *claim* paid or approved by the Government;

* * *

is liable to the United States Government [for a civil penalty and treble damages].

31 U.S.C. § 3729(a) (emphasis added). The Act in turn defines "claim" as follows:

> For purposes of this section, "claim" includes any request or demand . . . for money or property which is made to a . . . grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such . . . grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). The Act thus addresses a false or fraudulent claim even if the claim is "made to a . . . grantee, or other recipient" of U.S. money so long as the claim would draw on money of which the U.S. government provides "any portion."

Textually, therefore, a claim made to a grantee of U.S. money is not defined by the amount of money that the U.S. government paid directly to the claimant. So long as "*any portion*" of the claim is or will be funded by U.S. money *given to the grantee*, the full claim satisfies the definition of claim as used in § 3729(a)(1) or (a)(2). The district court thus erred when it concluded that "it is necessary to consider each source of funds separately to determine whether a request for payment therefrom *constitutes a 'claim.'*" *DRC I*, 376 F. Supp. 2d at 641 (emphasis added). And its conclusion that "if the funds used to pay the Custer Battles contracts were 'Iraqi funds,' even if administered or held in the possession of the United States, then the presentment of a fraudulent request for payment from these funds does not constitute a 'claim' within the meaning of the [False Claims Act]" was also erroneous. *See id.*; *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (noting that the False Claims Act "does not make the

extent of [funds'] safeguard dependent upon the bookkeeping devices used for their distribution").

The district court also erred in imposing a "control of funds" requirement. The court concluded that when U.S. funds (the $210 million in "vested funds") were transferred to the Development Fund for Iraq, the United States "relinquished control of those funds and they ceased to be United States government property," such that "the United States did not '*provide*' a portion of the money or property requested or demanded from the [Development Fund for Iraq], as § 3729(c) requires, even if it, at one time, *provided* a portion of the money now held in the [Development Fund for Iraq]." *DRC I*, 376 F. Supp. 2d at 646. This interpretation overlooks the False Claims Act's language that includes claims "*made to a . . . grantee, or other recipient*" of U.S. funds, so long as the United States "provides any portion" of the funds that the grantees or recipients would use to pay the claim. 31 U.S.C. § 3729(c). This statutory language precludes an interpretation requiring that the U.S. retain control over funds used to pay claims by extending the reach of the Act to money in the hands of a U.S. government "grantee" or "other recipient." A grantee is one to whom the money is given, and the U.S. need no longer have control over the funds.

In this case, the record demonstrates that over and above the $3-million advance it received, Custer Battles made claims to a grantee of U.S. money, *i.e.*, the Coalition Authority, and that the claims were paid from the grantee's funds, *i.e.*, the Development Fund for Iraq, a portion of which was provided to the grantee by the U.S. government, *i.e.*, $210 million.

Custer Battles contends that the language of the Dinar Exchange Contract itself precludes a finding that its requests for payment under that contract are "claims." That contractual language provides, "No funds, appropriated or other, of any Coalition country are or will be obligated under this contract."

This language, however, provides no support to Custer Battles. Section 3729(c) does not define a "claim" in relation to the *obligation* of the United States government but rather to the *provision* of United States funds. For the Dinar Exchange Contract the United States provided funds not only directly but also to the Development Fund for Iraq, a portion of which was used to pay the claims.

Custer Battles also argues that their requests or demands were not "claims" because Custer Battles was not in privity with the United States government. But the statutory language provides no indication that Congress intended to require privity. Indeed, the Supreme Court recently rejected the very notion in *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123, 2129-30 (2008). In *Allison Engine*, the Court held that a subcontractor could be liable for submitting a false claim to a prime contractor of the United States. *Id.* at 2130. Of course, a subcontractor is by definition not in privity with the U.S. government. *See also Marcus*, 317 U.S. at 544-45 (liability attaches "without regard to whether [the defrauding claimant] had direct contractual relations with the government").

We thus conclude that all false or fraudulent claims made by Custer Battles under the Dinar Exchange Contract were "claims" as defined in 31 U.S.C. § 3729(c) and used in § 3729(a).

In the end, the district court's source-of-funds analysis might prove harmless because damages sustained by the United States might not have exceeded the $3-million amount found by the jury. Nonetheless, all of the false or fraudulent claims presented on the $15-million Dinar Exchange Contract were qualifying "claims" under the False Claims Act, although damages would be limited to those sustained by the United States. We cannot, on appeal, determine the United States' damages and therefore determine whether the district court's errors were indeed harmless. Thus, we reverse the dis-

trict court's order limiting the definition of "claims" and remand to give the relators the right to elect a new trial on the claims made under the Dinar Exchange Contract. We do not order a new trial because the claims that the jury found in its verdict to be claims did indeed qualify as "claims" under the False Claims Act.

## III

The relators also contend that the district court erred in granting Custer Battles' motion for judgment as a matter of law, filed under Federal Rule of Civil Procedure 50(a). Specifically, relators challenge the court's conclusion that the relators "failed to produce sufficient evidence of presentment," as it construed both § 3729(a)(1) and § 3729(a)(2) to require. *DRC II*, 444 F. Supp. 2d at 689. The district court held that because the False Claims Act requires presentment to "an officer or employee of the United States Government," presentment to the Coalition Authority did not satisfy the requirement because the Coalition Authority was not an instrumentality of the United States. As the court explained:

> [A]lthough the [Coalition Authority] was principally controlled and funded by the U.S., this degree of control did not rise to the level of exclusive control required to qualify as an instrumentality of the U.S. government. . . . Thus, it follows that because the [Coalition Authority] was not a U.S. government entity, and therefore U.S. employees of the [Coalition Authority] were not working in their official capacity as employees or officers of the United States government, relators have demonstrably failed to provide sufficient evidence to enable a jury to find presentment, as required by both § 3729(a)(1) and § 3729(a)(2).

*Id.* The court accordingly granted judgment as a matter of law in favor of Custer Battles on both Counts I and II. *Id.* at 692.

Because the court found the evidence of presentment insufficient, it did not decide three other issues raised in Custer Battles' Rule 50(a) motion, *i.e.*, whether the claims were materially false; whether the United States suffered damage; and whether the individual defendants had sufficient knowledge of the fraudulent conduct to be liable. *See DRC II*, 444 F. Supp. 2d at 689.

"Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment," *Chaudhry v. Gallerizzo*, 174 F.3d 394, 405 (4th Cir. 1999) (internal quotation marks and citation omitted), and we review a district court's judgment as a matter of law *de novo*, *id.* at 404-05.

Section 3729(a)(1) of the False Claims Act creates liability for any person who "knowingly presents, or causes to be presented, *to an officer or employee of the United States Government or a member of the Armed Forces of the United States* a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis added). To fulfill this requirement, the relators presented extensive evidence that Custer Battles presented or caused to be presented fraudulently inflated invoices to U.S. government personnel who were detailed to the Coalition Authority. Indeed, the district court observed about the sufficiency of this evidence that "the trial record is replete with evidence that invoices and records were presented to [Coalition Authority] employees, including members of the United States Armed Forces detailed to the [Coalition Authority]." *DRC II*, 444 F. Supp. 2d at 686.

But the district court found that this evidence did not fulfill the presentment requirement, as "the presentment requirement could not be satisfied by presentment to a United States government employee or officer where the employee or officer is not working in his or her official U.S. capacity." *DRC II*, 444 F. Supp. 2d at 684. As an example, the district court noted that "if a contractor submitted a false claim to a U.S. govern-

ment employee for remodeling her kitchen, the presentment requirement would not be satisfied." *Id.* (quoting *DRC I*, 376 F. Supp. 2d at 648 n.86). Because the U.S. government personnel were detailed to the Coalition Authority at the time of presentment, the district court concluded that they could not have been acting in the requisite official capacity as employees of the United States.

While we agree with the district court that § 3729(a)(1) requires that presentment be made to U.S. government personnel working in their official capacity, we conclude that the court erred in assuming that U.S. government personnel detailed to the Coalition Authority could not be working in their official capacities as U.S. government employees. This can be demonstrated by reexamining the district court's hypothetical about "a contractor submit[ing] a false claim to a U.S. government employee for remodeling her kitchen." *DRC II*, 444 F. Supp. 2d at 684. If that employee were a soldier detailed to remodel the kitchen in her government-owned housing, the court would surely have to hesitate in concluding that the soldier was not acting in her official capacity when the soldier's orders required her to remodel the kitchen.

In this case the relators introduced ample evidence to show that the fraudulently inflated invoices were presented to U.S. government employees or officials who were acting in their official capacities. They demonstrated that invoices claiming payment were presented in the first instance to professional U.S. government contracting officers, who were paid and supervised by the U.S. Military. The principal contracting officer, Patricia Logsdon, who was typical of those who administered the Dinar Exchange Contract, testified that she was a contracting officer working for and paid by the U.S. Army Contracting Agency. She functioned under a "warrant," a document authorizing her to contract on behalf of the United States and to administer the Dinar Exchange Contract. She stated that as a contracting officer she was "someone who [was] warranted by the appropriate authority to spend U.S. tax

dollars." In describing her particular function on the Dinar Exchange Contract as a U.S. Army Contracting Officer, she testified:

> My responsibilities included ensuring that performance was done; that if there were any changes that needed to be made, that they were done in accordance with the contract; if there were fund issues that needed to be addressed, that I ensured that the proper funding was there.

Finally, Ms. Logsdon testified that she reported to Colonel Anthony Bell of the U.S. Military.

Patricia Logsdon's successor, Lori Pierce, testified similarly. Ms. Pierce testified that she also operated under a "warrant," which "vests in a government employee the right—well, it's actually a document that says that you have the authority to execute contractual documents on behalf of the U.S. Government."

After Custer Battles' invoices were "administered" by the contracting officers, they were presented for approval to consultants managing the contract. In the case of the Dinar Exchange Contract, the contract was managed by employees of BearingPoint, Inc., a contractor hired by the U.S. Agency for International Development to help manage the Dinar Exchange Contract, and by members of the U.S. Military. BearingPoint in turn answered to U.S. General Hugh Tant, who was in charge of implementing the dinar exchange program. Finally, once approved, the invoices were presented to U.S. Military officers working in the financial office of the Coalition Authority for payment from available funds.

In short, the evidence showed that Patricia Logsdon and her other two counterparts, while detailed to the Coalition Authority, were functioning as employees of the United States to do precisely the jobs that the United States hired them to

do full-time and for which the United States paid them. We conclude that this evidence was sufficient for a jury to conclude that the invoices on the Dinar Exchange Contract were presented to "an officer or employee of the United States Government or a member of the Armed Forces of the United States." 31 U.S.C. § 3729(a)(1).

The district court's interpretation of § 3729(a)(1) appears to derive from its assumption that the presentation to a U.S. officer or employee must be for payment or approval "by the U.S. government." But the text of § 3729(a)(1) does not contain that language or that requirement. It stands in stark contrast to § 3729(a)(2), which *does* contain the requirement of intent to "get" the claim "paid or approved *by the Government*." As the Supreme Court has repeatedly stated, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (internal quotation marks and citation omitted). Here, Congress included a requirement of payment or approval "by the Government" in § 3729(a)(2), but not in § 3729(a)(1). Thus, courts are not free to read "by the Government" into (a)(1) when Congress omitted it.

Moreover, our conclusion comports with the structure created by the juxtaposition of §§ 3729(a)(1) and 3729(a)(2). Section 3729(a)(1) defines liability in terms of the *person* to whom the claim is presented, whereas § 3729(a)(2) defines liability in terms of the intended *source* of the payment or approval.

Custer Battles argues also that, with respect to the $3-million advance payment, there was no *presentment* to a U.S. official or employee because it submitted no claim or invoice *before* receiving that advance. But this argument ignores the fact that the $3-million advance was expressly conditioned upon the subsequent submission and approval of invoices jus-

tifying the advance. Moreover, the language of § 3729(a)(1) covers not only presentment of claims *for payment*, but also presentment of claims *for approval*. *See* 31 U.S.C. § 3729(a)(1).

Because the relators have introduced evidence sufficient for a jury reasonably to conclude that Custer Battles presented or caused to be presented fraudulently inflated invoices to persons acting in their official capacity as U.S. officials or employees, we reverse the district court's order granting Custer Battles' Rule 50(a) motion.

The district court also granted judgment as a matter of law on the relators' claims based on 31 U.S.C. § 3729(a)(2), which provides that "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government." The district court concluded that this language implicitly requires *presentment* to a U.S. officer or employee acting in the officer or employee's official capacity. *DRC II*, 444 F. Supp. 2d at 685. Because the court found the relators' evidence of presentment insufficient, it also granted judgment as a matter of law on their claims made under § 3729(a)(2).

The district court's holding that § 3729(a)(2) has a "presentment" requirement has subsequently been rejected by the Supreme Court in *Allison Engine*, 128 S. Ct. at 2129-30. The Supreme Court reasoned that because the statutory language in § 3729(a)(1) expressly requires presentment, courts should not read such a requirement into § 3729(a)(2) when the statutory language does not expressly contain that requirement. In light of the Supreme Court's holding in *Allison Engine*, we conclude that the district court erred in finding a presentment requirement in § 3729(a)(2), recognizing that the district court did not have the benefit of *Allison Engine*.

In short, we hold that the district court erred in basing its order granting Custer Battles' Rule 50(a) motion on an insuf-

ficiency of evidence with respect to presentment. This leaves open the other arguments advanced by Custer Battles in its Rule 50(a) motion, which the court did not address. Accordingly, we remand this case to the district court to allow it to address the other points raised by Custer Battles' Rule 50(a) motion, provided that the relators do not first elect a new trial as authorized by our determination in Part II, above. If the court denies the Rule 50(a) motion, it should enter judgment on the verdict.

IV

Finally, relators contend that the district court erred in granting summary judgment to Custer Battles on the Airport Contract claim. *See DRC III*, 472 F. Supp. 2d at 788. At its core, the relators' claim with respect to the Airport Contract was based on alleged fraud-in-the-inducement — that Custer Battles promised 138 security personnel but actually provided fewer.

A review of the record, however, reveals that the proposal submitted by Custer Battles to the Coalition Authority neither stated nor promised that Custer Battles would provide 138 security personnel, nor did any of the relevant contracts refer to that number. And because the Airport Contract was for a fixed price, no invoices for personnel expenses were submitted.

The relators rely solely upon Custer Battles' "detailed cost estimate" for the Airport Contract which was based on the salaries of 138.5 security-related personnel. But this figure was just an estimate of the costs of providing security to enable Custer Battles to make a fixed-price proposal to the Coalition Authority, and that figure did not become a part of any commitment made by Custer Battles. Indeed, Franklin D. Hatfield, the Coalition Authority's Minister of Transportation, testified in his affidavit that "Custer Battles was not required to maintain any particular staffing levels in order to receive payment

under the [Airport] Contract." Moreover, relator Robert Isakson testified in his deposition that Custer Battles actually commenced performance of the contract with *more than* 138 personnel, although the number throughout the performance of the contract fluctuated.

We agree with the district court that the relators have not presented evidence sufficient to support finding that Custer Battles violated the False Claims Act in connection with the Airport Contract. *See DRC III*, 472 F. Supp. 2d at 800 ("the undisputed facts manifestly demonstrate that Relators cannot establish a fraudulent inducement claim"). Accordingly, we affirm the district court's summary judgment in favor of Custer Battles on that claim.

V

In sum, we conclude: (1) that the district court erred in limiting the relators' claim for damages on the Dinar Exchange Contract to a claim for $3 million; (2) that the court erred in ruling as a matter of law that the relators did not present evidence sufficient to demonstrate that Custer Battles presented false claims on the Dinar Exchange Contract to officers or employees of the United States; (3) that the court erred in implying a requirement of presentment in 31 U.S.C. § 3729(a)(2); and (4) that the court correctly entered summary judgment in favor of Custer Battles on the Airport Contract.

Accordingly, we reverse the district court's orders limiting the relators' claims and granting Custer Battles' Rule 50(a) motion for judgment as a matter of law and remand for further proceedings. On remand, the district court shall first give the relators the option to have a new trial on the Dinar Exchange Contract claims and, if a new trial is not elected, shall address Custer Battles' remaining issues on its Rule 50(a) motion. If the court denies Custer Battles' Rule 50(a) motion on the remaining issues, it shall enter judgment on the verdict in

favor of the relators. We affirm the district court's summary judgment with respect to the Airport Contract.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED FOR FURTHER PROCEEDINGS*