UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1544

BRANELL HARRIS,

            Plaintiff - Appellant,

      v.

RESTON HOSPITAL CENTER, LLC,

            Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:10-cv-01431-CMH-TCB)

Argued:  March 19, 2013            Decided:  April 24, 2013

Before DUNCAN, FLOYD, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Annette Kay Rubin, Leesburg, Virginia, for Appellant. Sarah Aiman Belger, MCGUIREWOODS, LLP, Tysons Corner, Virginia, for Appellee.  **ON BRIEF:** Ronda Brown Esaw, MCGUIREWOODS, LLP, Tysons Corner, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Branell Harris ("Appellant") appeals from an order entered March 26, 2012, granting summary judgment to Reston Hospital Center ("Appellee" or "Reston Hospital") on her claim of discriminatory discharge brought pursuant to the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"). Appellant contends the district court erred by concluding Reston Hospital did not "regard" her as disabled because the evidence actually indicates the hospital was aware she suffered from a drug and alcohol addiction. She further asserts that the district court ignored proof establishing other elements of her claim, and, thus, improperly granted summary judgment. We disagree. In our view, Appellant failed to establish that she was a "qualified individual" with a disability because the undisputed facts indicate she could not objectively perform the essential functions of her job. Because Harris failed to establish this necessary ingredient of her claim, we affirm.

I.

Appellant began working as a registered nurse for Reston Hospital in its surgical unit in 2002. She was interviewed and hired by Nancy Susco, director of the surgical unit, who continued to act as Appellant's direct supervisor throughout her employment. As part of her job, Appellant

2

provided direct care to patients recovering from surgery, including the administration of medications and narcotics.

## A.

After approximately one year of work at Reston Hospital, Appellant attempted suicide on two occasions in 2003. During her first attempt, she intentionally overdosed on the prescription sleep aid Ambien. Appellant attempted suicide a second time, when, after taking several over-the-counter sleep aids, she crushed Ambien, mixed it with Dilaudid -- a narcotic prescribed to treat moderate to severe pain -- and water, and injected it into her veins. Appellant obtained the Dilaudid by impermissibly diverting it from leftover pain pumps at Reston Hospital.

As a result of her diversion of a narcotic, Appellant submitted to the Commonwealth of Virginia's Health Practitioners' Intervention Program ("HPIP") in 2003 as an alternative to discipline by Reston Hospital and also as a requirement for retaining her nursing license. HPIP is administered by the Commonwealth, and Susco served as an on-site monitor for the program at Reston Hospital. As part of her participation in HPIP, Appellant was required to seek ongoing treatment, submit to random drug screenings, and "abstain completely from alcohol, marijuana, stimulants, cocaine, narcotics, sedatives, tranquilizers, and all other potentially

3

addicting or mind-altering medications or drugs." J.A. 386.[1] Thus, Appellant was prohibited from taking Ambien and other sleep aids during her participation in the program. As the work site monitor for the HPIP program, Susco submitted periodic reports to HPIP regarding Appellant's work performance.

Appellant was on an approved leave of absence from Reston Hospital to seek treatment through HPIP beginning in June 2003. She initially received three months of leave under the Family and Medical Leave Act ("FMLA"), and when she exhausted her FMLA leave, Reston Hospital permitted Appellant to take an additional three months of extended leave. After her return to work, and for a period of several months during her participation in HPIP, Appellant was prohibited from administering narcotics to patients. Reston Hospital assigned another nurse to administer narcotics to Appellant's patients during this time.

The original length of Appellant's participation in HPIP was five years with a completion date of 2008; however, it was extended by one year after she violated the terms of her agreement with HPIP in 2007 by obtaining a prescription for Lunesta, a sedative in the same family as Ambien. Yet Reston

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Hospital did not discipline her as a result. Instead, Appellant took another approved leave of absence between August and November 2007 relating to additional treatment through the HPIP program, and successfully completed the program in June 2009.

B.

In general, Appellant's periodic performance reviews at Reston Hospital indicate a "satisfactory" performance.[2] Even so, on four occasions in 2008, Appellant made mistakes administering medications to patients. She was responsible, as part of her duties on the surgical unit, for verifying that what is entered into the hospital's medication administration record by the pharmacist is the correct dosage, route, and frequency ordered by the physician.[3] According to Susco, it is rare for

---

[2] According to the employee performance evaluation form, a score of "2" or below indicates unsatisfactory/below expectations. Appellant received scores of 3.04 in 2007, 3.04 in 2008, and 2.81 in 2009. Appellant's evaluations also indicated that she had consistent problems assisting peers. As a result, Susco met with Appellant annually to discuss her performance and counseled her on at least three additional occasions to address the issue.

[3] The first error took place on April 30, 2008, when a patient was to receive a dose of medication at 11:00 a.m. Due to Appellant's failure to catch the mistake, the patient did not receive the medication until 11 hours later. The second mistake occurred on August 12, 2008, when Appellant failed to notice that the pharmacy forgot to order a certain medication for a patient. As a result, the patient did not receive the medication that the physician ordered. The third mistake occurred on October 18, 2008, when one of Appellant's patients was to receive a medication orally. Due to her failure to (Continued)

nurses on the surgical unit to make more than one or two medication errors in a given year, whereas Appellant made four medication errors during a six month period.

C.

According to Appellant, the events culminating in her dismissal on August 11, 2009, began earlier that month. Sometime during the morning of August 4, 2009, while walking into her house, Appellant tripped and fell onto a set of cement steps and suffered a head injury and a loss of consciousness. She woke up at the emergency room of Inova Loudoun Hospital sometime later, having been brought there by ambulance. Appellant has no recollection of anything that happened after falling and striking her head until she woke up in the hospital.

The record from Appellant's emergency room visit indicates "altered mental status" and "trauma." The attending physician noted that Appellant appeared groggy and planned to observe her overnight to determine whether the symptoms were connected to some substance or to the head trauma. The results of the toxicology report were negative for all substances with

monitor the chart properly, the patient instead received the dose intravenously. The fourth error occurred three days later, on October 21, 2008, when one of Appellant's patients was given twice as much medication as the physician had ordered.

the exception of Appellant's regularly prescribed anti-anxiety medication, Klonopin.

Having been hospitalized overnight, Appellant received a telephone call from her supervisor, Susco, on the morning of August 5 at 9:45 a.m., while still in Loudoun Hospital. Following an explanation of the events of the previous two days, Susco suspended Appellant for three days for a "no call/no show" because Appellant failed to show up for her shift or to call her supervisor within two hours after her shift began at 3:00 p.m. in accordance with Reston Hospital policy. Appellant was released from Loudoun Hospital later that day.

D.

After serving her suspension, Appellant reported to work timely on August 11, 2009, for her 3:00 p.m. shift. Per Appellant, she felt fine when she arrived. Shortly after clocking in, however, she began to feel woozy and to experience disorientation and nausea, "like the room was starting to spin." J.A. 73-74. She described her experience as episodic and coming over her in waves and said that she felt at some points as if she would lose consciousness. Several coworkers on the unit reported her behavior to the assistant director of the surgical unit, Cathy Hannon, who escorted Appellant off the floor and to

7

a conference room.[4]  Susco and Gina Gerard, the hospital's human resources director, were thereafter summoned to the conference room.

Appellant characterizes the meeting as very tense, stating that Susco and Gerard "hammer[ed]" her with questions about what medications she had taken and whether she was under the influence of alcohol and/or narcotics.  J.A. 77-78.  Susco testified regarding the meeting:

> So at that time, when I got there [Appellant] and [Hannon] were already in the conference room waiting for me.  And Gina Gerard came in and we talked to [Appellant].  And at that point she appeared impaired.

---

[4] Choon "Tina" Kim, a registered nurse who had worked on the surgical unit for 30 years, noticed that Appellant was acting strangely while she was reporting to Appellant on their shared patients.  Kim noticed that Appellant was not responding appropriately to the questions, and she was slurring her words. J.A. 198.  Additionally, the nurse who is taking over the shift will usually write down all of the patient information, but Kim observed Appellant just staring at the piece of paper she had in her hand.  Id.  Approximately 20 minutes after giving Appellant the report, Kim saw her staring blankly for several minutes at a computer monitor with a screensaver displayed rather than entering patient information into the computer.  Id.  Concerned that something was wrong, Kim approached Hannon and told her that she should check on Appellant because she was acting strangely.  Id.

Alisa Rooney, another veteran nurse on the surgical unit, also noticed that Appellant was slow to respond to questions. J.A. 200.  Rooney observed Appellant standing near the nurses' station appearing lost and not responding to at least two patient calls for assistance.  Id.  Rooney finally approached Appellant and offered to administer medication to one of her patients.  Id.  She then approached Hannon and expressed her concerns about Appellant's behavior.  Id.

8

She couldn't keep her eyes open. She was slumping over. Her speech was slow and slurred. So Gina felt it was the right next step to do to ask her [for] permission for a drug test.

* * * *

She was having trouble staying awake. She was not focusing. She was slurring her speech. We asked her if she had anything to drink or taken any drugs before she came to work. And she said that at midnight she had had two glasses of wine and had taken 20 milligrams of Ambien because she was nervous about coming back to work after her suspension. The 11th was the first day back to work after her suspension. And then when she couldn't go to sleep, and at 6:30 in the morning she had another glass of wine. And she took her regular prescriptive pills and she took some Klonopin, some Tylenol, and what she said was Methotrexate that she was taking for arthritis pain.

J.A. 117-18. At her deposition, Appellant testified that Gerard told her during the meeting in the conference room that she was fired, and denied telling those present that she had drank two glasses of wine the night before and one glass that morning. However, she admitted to drinking two glasses of wine around noon on the day before, August 10.

Appellant further testified regarding her condition on August 11:

Q. So at any time during August 11th when you were at Reston Hospital, did you tell anyone there something to the effect of, hey, I don't feel good or, hey, I feel sick, something like that?

A. Not that I recall.

* * * *

9

Q. When you were describing before lunch how you felt when this wave came over you, and I want to make sure I get your testimony right, I think you said you felt woozy, you felt nauseated, you felt like you were going to lose consciousness; is that correct?

A. That is correct.

Q. Do you think that you could safely administer medication when you were in that state on August 11th?

A. When that wave happened upon me, no.

Q. Do you think you were able to treat patients when that wave came upon you on August 11th?

A. No.

J.A. 83-84; see also id. 109-10.

While in the conference room, Appellant completed a form indicating what medications she had taken. She signed a drug test consent form and admitted that she was taking the following medications: Cymbalta, Clonazepam (Klonopin), Ambien, Tylenol, and Methotrexate -- each of which were regularly prescribed or over-the-counter. A phlebotomist arrived and drew Appellant's blood. She was then sent home. The results of the blood test, which were reported on August 17, 2009, were negative for narcotics and alcohol.[5]

---

[5] Appellant claims she was fired on August 11, 2009, whereas Susco contends Appellant was not discharged until August 19, after the blood test results had been reported. While we credit Appellant's version for purposes of summary judgment, this dispute has no bearing on our disposition of her appeal.

Even so, Gerard and Susco discussed the situation and decided that given Appellant's inability to perform her job and safely treat patients on August 11, termination of her employment was warranted. Susco testified regarding the decision to discharge Appellant:

> Q. Why do you believe she was unable to - you the institution, Reston Hospital, why does Reston Hospital believe that she was unable to perform her job duties that day?
>
> MS. BELGER: Objection to form and foundation. You may answer.
>
> A. When she presented to work on that day at three o'clock she could not stay awake. She could not -- she was slurring her speech. She –
>
> Q. Appeared impaired?
>
> A. Could not -- appeared impaired. And I could not let her take responsibility for a patient load. First priority is to our patients. And that's why she was removed from the floor that day.
>
> Q. And I understand why she would be removed from the floor that day. Why was she fired?
>
> MS. BELGER: Same objection.
>
> A. This was just the last straw in many things that had gone on with Branell [Harris].

J.A. 121:9-122:5.

Susco further testified that she also took into account Appellant's past disciplinary and performance record in making the decision to discharge, including her interactions

11

with her peers, her medication errors, and her recent no call/no show:

> Q. Okay. So what conversation did you have with Gina Gerard about terminating Branell?
>
> A. She asked me what my thought process was and the fact that this was not the first issue that we had with Branell's performance. And she told me that she had consulted with Lesley and with HCA corporate, and that the decision was made to go ahead with the termination.
>
> Q. Did you offer any insight or input to Gina Gerard as part of these discussions?
>
> A. Gina already knew about the performance history with Branell.
>
> Q. When you say the performance history with Branell, can you be more specific?
>
> A. She knew about any of her previous counselings.

J.A. 123:3-124:11.[6]

In Appellant's view of events, her impairment on August 11 was caused by a latent manifestation of the head injury she received as a result of her fall on August 4, rather than by drugs or alcohol. In this regard, Appellant directs us to evidence from her primary treating physician, Dr. Michael G. Bowers, D.O., whom she visited on September 15, 2009, several weeks after she was fired by Reston Hospital. Upon examining Appellant, who had complained of ongoing headaches, Dr. Bowers

---

[6] The "previous counselings" refer to the response by the hospital to Appellant's past performance evaluations. See supra note 2.

12

reported that she "may have been suffering from post-concussion syndrome." J.A. 187. He testified regarding post-concussion syndrome, "Post[-]concussion syndrome [. . . ] is like kind of a timeline. So, if you have still concussive issues, meaning headaches, memory loss, you know, maybe some cognizant deficits during the day, even nausea." Id. 277. When asked during his disposition whether his testimony could be characterized as not "definitively" diagnosing Appellant as having a concussion, Dr. Bowers testified:

> I would say based on [sic] because I have to rely solely on her history of present illness, not having records, and then when I examine her, that is correct. I could not definitively say yes, you had a concussion. But based on symptomatology and discussion I would have to label it as a concussion.

Id. 188.

### E.

On December 21, 2010, Appellant commenced this action by filing a complaint against Reston Hospital in the Eastern District of Virginia. She filed an amended complaint on June 21, 2011, asserting that Reston Hospital wrongfully discharged her on the basis of a drug and alcohol addiction disability. Following discovery, the hospital moved for summary judgment, which was granted by the district court on March 26, 2012.

In the main, the district court concluded that Appellant failed to present evidence "indicating that Reston

13

Hospital knew or believed that Plaintiff had any problems with alcohol prior to her termination" such that she met her burden to show that Appellee "regarded" her as disabled. See Harris v. Reston Hosp. Ctr., LLC, 1:10-CV-1431, 2012 WL 1080990, at *5 (E.D. Va. Mar. 26, 2012). The district court likewise refused to consider an additional theory of recovery introduced by Appellant for the first time in response to Appellee's motion for summary judgment, namely, that Appellant was fired because she had a "record" of impairment. The district court reasoned that to allow Appellant's assertion of a new legal theory -- outside of the complaint and after discovery -- to defeat summary judgment would unfairly prejudice Reston Hospital.

The district court also determined that Appellant failed to present sufficient evidence indicating she was a "qualified individual." The district court explained as follows:

> Plaintiff has not demonstrated that she was performing her job at a level that met Reston Hospital's legitimate expectations at the time or her termination in August 2009. Plaintiff had been counseled at least three times since 2007 regarding the need to be more consistent in assisting her peers. Additionally, Plaintiff had been given a written warning in 2008 for four medication occurrences in one year. Plaintiff was suspended for three days for a No Call/No Show on August 4, 2009. Finally, on the day that Plaintiff returned from her suspension, on August 11, 2009, Plaintiff's behavior concerned multiple coworkers. Plaintiff slurred her words, did not respond appropriately to questions, failed to respond to several patient calls for medication, stared blankly

14

> at a Screensaver on a computer monitor, and had trouble staying awake.

Harris, 2012 WL 1080990 at *6.

The district court next concluded that even if Appellant presented a prima facie case, "Plaintiff's actions gave Reston Hospital legitimate, nondiscriminatory reasons to terminate Plaintiff's employment, and Plaintiff's claim that Reston Hospital illegally terminated her due to a perceived disability is belied by the fact that Reston Hospital continually accommodated Plaintiff and allowed Plaintiff to maintain her employment." Id. Finally, the district court observed that Appellant failed to produce any evidence that Appellee "had any discriminatory intent or that Reston Hospital's reasons for terminating Plaintiff's employment were pretextual," or that "Plaintiff's inability to perform the essential functions of her job were not Reston's [sic] Hospital's legitimate reasons for terminating her employment." Id. at *7. Harris timely appealed.

Appellant presents two issues on appeal: 1) whether the district court improperly declined to consider Appellant's new legal theory that the hospital terminated her due to a "record" of impairment; and 2) whether the district court erred when it found that Appellant failed to present a prima facie

15

case for discrimination pursuant to the "regarded as" definition of disability.[7]

## II.

We review de novo a district court's order granting summary judgment. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012).

## III.

The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3353, prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[8] A "disability" is defined as (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a

---

[7] In making her case, Appellant relies on statements taken from the administrative proceedings before the Virginia Employment Commission and the Virginia Board of Nursing. The district court properly disregarded these statements because the use of such information in judicial proceedings is prohibited by Virginia law. See Va. Code Ann. § 60.2-623(B) (Virginia Employment Commission); id. § 54.1-2400.2 (Virginia Board of Nursing). We likewise disregard these statements.

[8] Because Appellant's claim arose after the effective date of the ADAAA, we apply the amended version.

record of such impairment; or (C) being regarded as having such an impairment.  Id. § 12102(1).

### A.

Appellant first argues that the district court improperly refused to consider an additional theory of recovery, asserted for the first time in her opposition to Appellee's motion for summary judgment, that she has a "record" of a physical or mental impairment that substantially limits one or more major life activities.[9]

Addressing the new theory, the district court stated, "any such 'record' does not appear in the Charge of Discrimination that Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") or her Amended Complaint, nor did Plaintiff assert any such record in her answers to interrogatories or at her deposition."  Harris, 2012 WL 1080990, at *4.  Because the district court determined that asserting a new legal theory for the first time in opposing summary judgment amounted to constructive amendment of the amended complaint and thus unfairly prejudiced the defendant, the district court refused to consider it.  Id. (citing United States ex rel. DRC, Inc. v. Custer Battles, LLC, 472 F. Supp. 2d 787, 795-96 (E.D.

---

[9]  This theory implicates the second definition of disability.  See 42 U.S.C. § 12102(1)(B) ("disability" means "a record of such an impairment. . . .").

17

Va. 2007) <u>aff'd</u>, 562 F.3d 295 (4th Cir. 2009)). The district court also concluded that Appellant failed to exhaust her administrative remedies as to the "record" of impairment argument. <u>Id.</u> (citing <u>Miles v. Dell, Inc.</u>, 429 F.3d 480, 491 (4th Cir. 2005)).

We conclude that the district court did not err in refusing to consider the new argument as an impermissible attempt to constructively amend the complaint. Because a complaint "guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations," constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant. <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1292-93 (9th Cir. 2000); <u>see</u> <u>Deasy v. Hill</u>, 833 F.2d 38, 40-42 (4th Cir. 1987); <u>Josey v. John R. Hollingsworth Corp.</u>, 996 F.2d 632, 642 (3d Cir. 1993).[10]

---

[10] <u>See also</u> <u>Cloaninger v. McDevitt</u>, 555 F.3d 324, 336 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."); <u>Priddy v. Edelman</u>, 883 F.2d 438, 446 (6th Cir. 1989) ("A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint."); <u>Feldman v. Allegheny Int'l, Inc.</u>, 850 F.2d 1217, 1225 (7th Cir. 1988) ("Defense of a new claim obviously will require additional rounds of discovery, in all probability interview of new witnesses, gathering of further evidence, and the identification (Continued)

18

Indeed, Appellant did not at any time request leave to amend her pleadings. As a result, Appellee conducted discovery and crafted defenses based on Appellant's claim as set forth in the amended complaint, which alleges Appellee "regarded [her] as" disabled. See 42 U.S.C. § 12102(1)(C). Defense of the claim that Appellant had a "record of such an impairment," id. § 12102(1)(B), plainly requires different discoverable inquiries. Allowing this new theory, asserted in a response brief no less, to defeat Appellee's motion would amount to constructive amendment of the controlling complaint, placing a clear burden on Appellee's ability to effectively and efficiently defend itself. We affirm the district court's decision in this regard and thus need not address whether the "record" of impairment theory is barred by Appellant's failure to exhaust her administrative remedies.

B.

A plaintiff establishes a prima facie case of wrongful discharge under the ADA if she demonstrates that (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her

---

of appropriate legal arguments. All this necessarily takes time.").

discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Rohan v. Networks Presentations LLC, 375 F.3d 266, 273 n.9 (4th Cir. 2004); Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). "Evidence of all four of these elements is necessary to survive summary judgment." Reynolds, 701 F.3d at 150. Appellant's claim falters on the first step.

"One is within the ADA's protected class if one is a 'qualified individual with a disability.'" Haulbrook, 252 F.3d at at 702 (quoting 42 U.S.C. § 12112). Under the ADA, a "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). See Rohan, 375 F.3d at 278-79; Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994). "A job function is essential if it 'bear[s] more than a marginal relationship to the job at issue.'" Rohan, 375 F.3d at 279 (quoting Tyndall, 31 F.3d at 213). Appellant bears the burden of establishing that she could perform the essential functions of her job. See Tyndall, 31 F.3d at 213.

At the outset, we recognize the undisputed fact that an essential function of Appellant's job as a registered nurse in the surgical unit at Reston Hospital was the care and

20

treatment of patients, principally including the safe and accurate administration of medications. We agree with the district court that Appellant failed to demonstrate that she could perform this essential function. Indeed, Appellant's concession that she was not capable of safely treating patients or administering medication on August 11, 2009, the date of her discharge, underscores her overall failure to satisfy this element. Her employment record is riddled with repeated absences stretching over several years and personnel evaluations demonstrating barely satisfactory-level performance. Appellant's extensive absences and physical incapacity -- regardless of their precise causes -- would significantly interfere with, if not wholly negate, her ability to perform the essential functions of a surgical floor nurse. Because Appellant failed to establish that she was a "qualified individual" with a disability, the district court properly entered judgment in favor of Reston Hospital.[11]

---

[11] Even if we concluded Appellant had established that she was a "qualified individual" with a disability, we would nonetheless affirm the district court because she utterly failed to present evidence demonstrating that, at the time of discharge, she was performing her job at a level that met her employer's legitimate expectations. See Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc., 53 F.3d 55, 61-62 (4th Cir. 1995).

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.